UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF ST. CLAIR SHORES POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CREDIT SUISSE GROUP AG, THOMAS GOTTSTEIN, LARA J. WARNER and DAVID R. MATHERS,<br><br>Defendants. | Civil Action No. 1:21-cv-03385<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, City of St. Clair Shores Police and Fire Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Credit Suisse Group AG ("Credit Suisse" or the "Company"), Company press releases, conference call transcripts and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Credit Suisse American Depositary Receipts ("ADRs") between October 29, 2020 and March 31, 2021 (the "Class Period"), against Credit Suisse and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Credit Suisse is a global financial services company based in Zurich, Switzerland.  It has branch offices in the United States and around the globe, and its ADRs are listed and trade on the New York Stock Exchange ("NYSE").  During the Class Period, defendants issued materially false and misleading statements regarding the Company's business metrics and financial prospects.  Specifically, defendants concealed material defects in the Company's risk policies and procedures and compliance oversight functions and efforts to allow high-risk clients to take on excessive leverage, including Greensill Capital ("Greensill") and Archegos Capital Management ("Archegos"), exposing the Company to billions of dollars in losses.  Not only did defendants conceal these operational landmines from Credit Suisse investors, which caused the price of Credit Suisse securities to be artificially inflated, but they also undertook actions indicating that Credit Suisse

securities were substantially undervalued, such as a massive stock buy-back program worth 1.5 billion Swiss francs worth (equivalent to $1.6 billion).

3.       As a result of defendants' false statements, Credit Suisse ADRs traded at artificially inflated prices, reaching a high of $14.95 per ADR by February 2021.  Following a series of corporate scandals which have revealed grave deficiencies in Credit Suisse's risk and compliance activities, the price of Credit Suisse ADRs plummeted, reaching a low of just $10.60 per ADR by March 31, 2021.

**Greeensill Capital**

4.       Until it filed for insolvency protection on March 8, 2021, Greensill was a financial services company based in the United Kingdom and Australia focused on the provision of supply-chain financing and related services.  Greensill was founded in 2011 by Lex Greensill.  Its revenue streams included offering conventional banking services through a German subsidiary, Greensill Bank (de), the offering of bonds based on debt it has purchased, and managing funds with partner organizations, primarily Credit Suisse.

5.       Greensill provided financing for companies that paid for orders from suppliers.  It allowed suppliers to be paid as soon as an order was placed rather than waiting for weeks or months. At the same time, it allowed large companies to lengthen their payment terms with Greensill, thereby bridging the gap between invoice date and payment date.

6.       In order to finance its activities, Greensill relied on loans provided by specialized supply-chain investment funds managed by Credit Suisse.  Greensill would issue notes bought by investment funds, thus providing Greensill with cash.  The repayment of these loans was secured by Greensill's entitlement to the cash paid to its clients' suppliers.  However, as recently disclosed by *Bloomberg* and *The Wall Street Journal*, Credit Suisse investment funds are alleged to have bought

notes tied to Greensill's "future accounts receivables finance" activity, meaning these loans were only secured by future and uncertain sales, and were therefore riskier.

7.      Credit Suisse in turn offered investment funds which provided exposure to the Greensill funds through its asset management unit, marketing them to its own clients such as pension funds.  Credit Suisse largely allowed Greensill – the seller of the assets – to decide what the funds would buy, without a Credit Suisse fund manager involved in the selection of the individual securities.  To increase the appeal to investors, many of the assets were insured, making them appear as safe but higher-yielding alternatives to money market funds.

8.      In July 2020, a group of insurers led by insurer Tokio Marine advised Greensill that it would stop providing insurance coverage.  The group was insuring $4.6 billion worth of Greensill assets.  The decision came after Tokio Marine discovered that its insurance of Greensill funds had exceeded internal risk limits.  Greensill tried to obtain an extension of the coverage, including by taking legal action against the insurers, but was ultimately unsuccessful.  Without the insurance backing up the loans, it became difficult to value the Greensill securities being marketed and sold by Credit Suisse.

9.      About that same time, Credit Suisse became aware that German banking authorities had begun investigating Greensill's Bremen-based bank.  In addition, in late 2020, Greensill began a search for a new outside independent auditor after growing too large for the firm's then-current auditor, Saffery Champness.  KPMG, Deloitte, members of the Big Four, and smaller accounting firm BDO all declined to become Greensill's new auditor.  Critically, Credit Suisse made a $160 million bridge loan to Greeensill in October 2020 that was approved by defendant Lara J. Warner over objections by Credit Suisse's own risk managers.  Nonetheless, shortly after the loan was

provided, Credit Suisse began to aggressively market the Greensill supply chain funds to its own clients.

10.     On March 1, 2021, Credit Suisse suddenly froze $10 billion in funds that were invested in Greensill's financial products and held by its supply-chain investment funds.

11.     On March 8, 2021, Greensill filed for insolvency protection, as it found itself unable to repay the $160 million loan to Credit Suisse, which had been paid down to $140 million. According to the *Financial Times*, more than 1,000 investors in the Greensill funds were unable to exit their positions.

12.     By March 10, 2021, it was disclosed that Greensill investors had retained counsel and intended to sue Credit Suisse for their losses because Credit Suisse continued to market the biggest of the funds as a fully insured, low-risk product despite a decision by insurers during the summer of 2020 not to renew coverage.  Edouard Fremault ("Fremault"), a partner at Deminor in Brussels, represented that his firm had already been approached by several investors who had suffered losses as high as 60% and were reviewing their legal options.  According to Fremault, the fund in question, Credit Suisse (Lux) Supply Chain Finance Fund, was promoted by Credit Suisse as fully insured and this played a key part in the investors' decision to choose it as a safe option.  "Investors were not informed that the insurance companies decided during the summer 2020 that they would no longer insure the underlying receivables with effect as from March 1," Fremault said as reported by *Bloomberg News*.  The *Financial Times* likewise reported that Greensill's collapse exposed Credit Suisse to billions of dollars in potential liability.  Credit Suisse later acknowledged $2.3 billion worth of problematic loans in its Greensill funds.

13.     As the market digested this news, the price of Credit Suisse ADRs collapsed from a close of $14.70 per ADR on March 1, 2021 to just $12.85 per ADR by market close on March 12, 2021, on unusually high volume, a decline of almost 13%.

**Archegos**

14.     Archegos is a family office investment fund run by Sung Kook (a.k.a. Bill) Hwang ("Hwang").  Hwang previously ran Tiger Asia Management until that firm pled guilty in 2012 to insider trading in Chinese bank stocks and the SEC banned Hwang from managing other people's money.  Hwang launched the Archegos family office fund with $200 million in 2013 to allow him to avoid the SEC trading ban.  By 2020, Hwang had grown the assets under management at Archegos to $10 billion.

15.     Archegos' investment holdings are primarily in the form of total return swaps, a financial instrument where the underlying securities (stocks) are held by the banks that broker the investments.  The swaps allow investors such as Archegos to bet on stock price moves, often with high levels of leverage, without owning the underlying shares.  Instead, banks buy and hold the stocks and give the fund a performance-related return.  The fund secures the trades by giving the bank collateral, such as cash or equities.  Archegos held assets of approximately $10 billion but utilized the leverage provided by its swaps strategy to gain exposure to more than $50 billion worth of securities.  Leverage is risky because it magnifies losses, just as it magnifies potential returns. The strategy was designed in part to allow Hwang to avoid margin limits and regulatory disclosure requirements.  Unbeknownst to investors and regulators, several large brokerage banks, including Credit Suisse, had each simultaneously allowed Archegos to take on billions of dollars of exposure to volatile equities through swaps contracts, dramatically elevating the risk posed by these concentrated positions

16.     While the Archegos family fund operated below the radar of the investing public and regulators, it became a very sought-after customer for fee-hungry banks like Credit Suisse.  As the *Financial Times* would later disclose in a March 30, 2021 report:

> *Hwang was seen as a compelling prospective client by prime brokers, the potentially lucrative but risky division of investment banks that loans cash and securities to hedge funds and processes their trades.*
>
> Concerns about his reputation and history were offset by ***a sense of the huge opportunities from dealing with him***, according to two of Archegos's prime brokers. He is known as an "aggressive, moneymaking genius", according to one analyst note, who grew Archegos from assets of about $200m at its 2012 launch to almost $10bn in just nine years.
>
> *The fee-hungry investment banks were ravenous for Hwang's trading commissions and desperate to lend him money so he could magnify his bets.*  Those included taking outsized positions in stocks such as Chinese technology company Baidu and US media giant Viacom.
>
> "***It's pretty hard for me to defend why we loaned him so much,"* said an executive at a bank with billions of dollars of exposure to Archegos*.

17.     During the week of March 22, 2021, the group of prime brokerage banks facilitating Archegos' high-risk strategy became concerned as the market value of some of the stock shares underlying its swaps positions declined.  On Friday, March 26, 2021, several of these banks – including Morgan Stanley, Goldman Sachs and UBS – began liquidating billions of dollars' worth of securities at fire-sale prices after Archegos failed to meet a margin call, further driving down prices. By the time Credit Suisse tried to liquidate its own positions underlying Archegos swap contracts over the ensuing weekend, prices had already collapsed and Credit Suisse quickly racked up billions of dollars in losses.

18.     After the market price of Credit Suisse ADRs plunged between Friday, March 26 and Monday, March 29, 2021 on this news, Credit Suisse issued a press release on March 29 conceding that "the loss resulting from this exit . . . could be highly significant and material to our first quarter

results."  The *Financial Times* then pegged Credit Suisse's estimated losses at between $3 billion and $5 billion, more than a year's worth of the Company's net profit.

19.     On March 30, 2021, the SEC summoned all of the banks embroiled in the Archegos affair, then being called "one of the biggest fund blowups in years."  S&P Global Ratings downgraded Credit Suisse's corporate debt rating that day to negative from stable, substantially increasing the Company's costs of capital.  S&P's press release stated in pertinent part that "[i]n our view, there is a meaningful risk that clarification of the reasons for a potential material loss related to a single client may reveal ***deficiencies in Credit Suisse group's risk management system or a risk appetite*** that is not commensurate with the current ratings."  The report added that "[a]s a result of its investment banking and asset management activities, ***Credit Suisse's risk profile remains complex and entails financial and nonfinancial risks***."  S&P further lamented that "[m]anagement of its relationships with the U.S. hedge fund and Greensill group also has potential to damage the bank's reputation, which was already tarnished following high-profile governance issues in 2020 and culminated with its CEO's departure," referring to defendant Thomas Gottstein's predecessor as Chief Executive Officer ("CEO") stepping down after a corporate espionage scandal.

20.     As reported by *The Wall Street Journal* on March 31, 2021, Credit Suisse "had a core capital buffer of 12.9% at year-end" and "[i]f the Archegos hit is $4 billion, that ratio could fall by roughly 1 percentage point to well below the 12.5% minimum targeted by the lender."  In addition, the report stated that even if Credit Suisse's capital ratios remain high enough to preclude its being forced to raise additional capital, Credit Suisse "[s]hareholders can expect ***a suspension of its share buyback program*** at the least."

21.     The market price of Credit Suisse ADRs fell another nearly 20% on this news, declining from their close of $13.21 per ADR on March 25, 2021 to close at $10.60 per ADR on March 31, 2021, on unusually high volume.

22.     The true facts, which were known or recklessly disregarded by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Credit Suisse's co-mingling of its lending, asset management, and private wealth management functions and imprudently aggressive pursuit of fees had materially diminished the Company's ability to properly assess and manage its own risk exposure to high-risk clients and potential liabilities from client losses;

(b)     Credit Suisse had ignored numerous red flags in connection with the Greensill funds, such as suspicious shipment activities during an internal compliance check, and overrode the concerns of the Company's in-house credit-structuring team in packing and selling billions of dollars' worth of Greensill-linked securities to investors;

(c)     Credit Suisse had conspired with Hwang to allow Archegos to covertly take on billions of dollars in excessively concentrated and risky positions by utilizing highly leveraged total return swaps, placing the risk of loss associated with these positions on Credit Suisse and its investors;

(d)     Credit Suisse was understating its exposure to risk and thus overstating its Tier 1 capital ratios in its public statements; and

(e)     Credit Suisse's internal controls were inadequate to ensure that the Company's potential liability to customers and losses arising from its exposure to customer losses were properly accounted for, managed and disclosed to investors.

23.     On April 6, 2021, Credit Suisse revealed that it would record a charge of 4.4 billion francs ($4.7 billion) in the first quarter of 2021 as a result of the Archegos losses, resulting in a 900 million franc loss for the first quarter 2021.  The Company also disclosed that Brian Chin, the CEO of its Investment Bank, and defendant Warner, its Chief Risk and Compliance Officer, were stepping down immediately.  Critically, Credit Suisse slashed its dividend by two-thirds to 0.10 francs per share and halted its plan to resume share buybacks.  The Company also launched separate external investigations into both the Archegos and Greensill debacles and a "tactical crisis committee" to deal with the fallout.

24.     On April 8, 2021, *The Wall Street Journal*, in an article entitled "Credit Suisse Ignored Warnings Before Archegos and Greensill Imploded," reported that Credit Suisse executives had long known about the excessive risks posed by the Company's Archegos and Greensill investments, but failed to disclose these facts to investors.

25.     As a result of defendants' false and misleading statements, Credit Suisse ADRs traded at inflated prices during the Class Period.  However, after the above revelations seeped into the market, the price of the Company's ADRs was hammered by massive sales, sending it down nearly 30% from its Class Period high.

## JURISDICTION AND VENUE

26.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

27.     Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  Credit Suisse has offices in this District and many of the acts and transactions giving rise to the violations of law complained of occurred here.

28.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

29.     Plaintiff City of St. Clair Shores Police and Fire Retirement System purchased Credit Suisse ADRs, as described in the attached certification incorporated herein, and was damaged thereby.

30.     Defendant Credit Suisse is a global financial services company.  Credit Suisse is based in Zurich, Switzerland, and has branch offices in the United States and around the globe.  Its ADRs, each representative of one share of Credit Suisse common stock, trade on the NYSE under the ticker symbol "CS."  As of December 31, 2020, Credit Suisse had more than 2.4 billion shares of its common stock issued and outstanding.

31.     Defendant Thomas Gottstein ("Gottstein") is, and at all relevant times was, the CEO of Credit Suisse.

32.     Defendant Lara J. Warner ("Warner) was, until her April 2021 departure, the Chief Risk and Compliance Officer of Credit Suisse.

33.     Defendant David R. Mathers ("Mathers") is, and at all relevant times was, Chief Financial Officer ("CFO") of Credit Suisse.

34.     Defendants Gottstein, Warner and Mathers (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Credit Suisse's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be

- 10 -

corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Gottstein, Warner and Mathers knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

35.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Credit Suisse.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Credit Suisse ADRs was a success, as it: (i) deceived the investing public regarding Credit Suisse's prospects and business; (ii) artificially inflated the prices of Credit Suisse ADRs; and (iii) caused plaintiff and other members of the Class (defined herein) to purchase Credit Suisse ADRs at inflated prices.

## BACKGROUND

36.     Credit Suisse operates as a financial services company.  Since defendant Gottstein's realignment in August 2020, the Company has reported in four segments, plus its "Corporate Center," including: (i) Swiss Universal Bank (which included both Private Clients and Corporate & Institutional Clients); (ii) International Wealth Management (which included Private Banking and Asset Management); (iii) Asia Pacific; and (iv) Investment Banking.  Also, as part of an August 2020 realignment, Credit Suisse combined its former Risk Management and Compliance functions into a single integrated Chief Risk and Compliance Officer function, permitting it to significantly slash a number of compliance and risk oversight positions which it now claimed were duplicative.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

37.     On October 29, 2020, Credit Suisse issued a press release announcing its third quarter 2020 ("3Q20") financial results for the interim period ended September 30, 2020.  The title of the

release emphasized the Company's ongoing "[s]trong business growth and continued capital generation." Highlighting the Company's "[s]trong capital position with CET1 ratio of 13.0% in 3Q20, up from 12.5% in 2Q20; Tier 1 leverage ratio of 6.3%[1] in 3Q20, up from 6.2% in 2Q20," the release stated that Credit Suisse was "[c]ommitted to deliver to shareholders," stating in pertinent part as follows:

- Board of Directors recommends shareholders to approve second half of 2019 dividend of CHF 0.1388 per share at forthcoming Extraordinary General Meeting (EGM) on November 27, 2020

- ***Continued accrual of 5% higher dividend for 2020 compared to 2019 dividend***

- ***Intention to restart share buybacks in January 2021, with a 2021 share buyback program of up to CHF 1.5 billion and an expected repurchase of at least CHF 1.0 billion next year***

(Footnote omitted.)

38.     The release also highlighted Credit Suisse's "[k]ey strategic highlights, ***delivering sustainable growth***," a "[c]ontinued momentum in Wealth Management businesses," a "[s]ingle global Investment Bank with adjusted* RoRC of 14% in 9M20 with strong revenue growth across fixed income sales and trading, equity sales and trading and capital markets," and a "[s]uccessful execution of key strategic initiatives as previously announced with expected gross savings of approximately CHF 400 million to CHF 450 million from 2022 onwards; allow for reinvestment in full, subject to market and economic conditions."

39.     The release further quoted defendant Gottstein, who highlighted the Company's purportedly strong business metrics and financial prospects and claimed the Company's balance sheet supported a dividend increase and large stock buyback, stating in pertinent part as follows:

"***We have once again proven the strength of our diversified business and we are confident that the refinements that we announced over the summer will provide further momentum*** as we complete the restructuring measures. With a strong CET1 ratio of 13.0%, ***we are well positioned to drive further balance sheet growth***. We

are pleased that we are proposing the payout of the second tranche of our 2019 dividend and that *we continue to accrue a 5% higher 2020 dividend for our shareholders*. Furthermore, we intend to resume our share buyback program in January 2021 *with a target repurchase of up to CHF 1.5 billion of shares and a minimum of at least CHF 1.0 billion for the full year*."

\*　　\*　　\*

**OUTLOOK**

As we move through the fourth quarter and look ahead to 2021, we are focusing on ensuring that we *continue to deliver outstanding products and services to our clients*, supporting them through the persisting COVID-19 pandemic and the resultant economic challenges. We would expect this environment to continue to result in elevated levels of transactional and trading activity, across both our wealth management and investment banking businesses, as our clients respond to the macroeconomic uncertainties. Furthermore, the interest rate environment should continue to support higher levels of financing demand, and we would expect higher loan growth to help Credit Suisse to offset the pressure from lower interest rates. While the path of the pandemic remains uncertain, *we have a significant CECL buffer on our balance sheet*; and we expect to continue to benefit further from our focus on the resilient Swiss economy. *With the CET1 capital ratio at 13%, we now believe that it is appropriate to pay our shareholders the second half of the 2019 dividend, to continue to accrue for our 2020 dividend payment and to resume the share buyback program next January*.

(Footnotes omitted.)

40.    During a conference call conducted later that afternoon with stock analysts and investors, defendant Gottstein opened his remarks by emphasizing the purportedly strong risk oversight built into Credit Suisse's August 2020 realignment of risk management oversight. He highlighted the purportedly "successful implementation to date of the strategic initiatives we announced a couple of months ago, including the creation of a single global investment bank, [and] the integration of our risk and compliance functions," and further stated that "[t]hese initiatives should allow us to invest in our wealth management related business in order to build on the considerable progress, we have already achieved, and to position ourselves even more strongly in 2021 and beyond as a leading wealth manager with strong global investment banking capabilities." He also claimed that Credit Suisse's "CET 1 ratio [had] increased from 12.5% in the second quarter

to 13% in the third quarter, ***supporting the ongoing strong capital generation as well as measures we took to mitigate the impact of COVID-19 on risk-weighted assets***."  Defendant Gottstein went on to again emphasize that the Company's strong balance sheet supported the planned 5% dividend increase and the massive stock buyback program.

41.     On November 23, 2020, Credit Suisse filed its 3Q20 Pillar 3 and regulatory disclosures with the SEC on Form 6-K which were signed by defendants Warner and Mathers. Among other things, the 3Q20 Pillar 3 report stated that Credit Suisse had a CET1 ratio of 13.0%.

42.     On November 27, 2020, Credit Suisse issued a press release announcing that shareholders had approved a second distribution of its 2019 dividend at an Extraordinary General Meeting of shareholders.  The release quoted Urs Rohner, the Chairman of the Board of Directors of Credit Suisse, who stated that "'***[b]ased on our proven strategy, strong capital position and well-executed crisis response, and in line with our intention to increase the dividend by at least 5% per annum***, we had proposed to approve the second distribution of the 2019 dividend, to allow for the full distribution of the dividend for the financial year 2019.  On behalf of the Board of Directors, I would like to thank our shareholders for approving our proposal.'"

43.     On December 15, 2020, Credit Suisse issued a press release announcing a 2020 Investor Update which emphasized Credit Suisse's "[a]ccelerating growth in strategic business areas, continuing to deliver for our stakeholders."  The release provided the following "[f]inancial ambitions" and quoted defendant Gottstein stating how the Company was on track to achieve them, stating in pertinent part as follows:

Financial ambitions:

- Reconfirm medium-term ambition of a Return on Tangible Equity (RoTE) of 10% to 12%

- Operate with a CET1 ratio of at least 12.5% for at least the first half of 2021 given the ongoing COVID-19 pandemic

- ***Continue to accrue for at least 5% dividend growth per annum***, including with respect to the planned 2020 dividend compared to CHF 0.2776 per share paid this year

- ***Intend to restart share buybacks in January 2021 of up to CHF 1.5 billion***, with at least CHF 1.0 billion, for the full year, subject to market and economic conditions

**Thomas Gottstein, Chief Executive Officer of Credit Suisse Group AG, commented**:

"Today, we are outlining our ambitious and ***achievable growth agenda for 2021*** and beyond, including broad-based investment initiatives to accelerate growth in our Wealth Management-related businesses and our Investment Bank, with a commitment to placing Sustainability and our new SRI function at the heart of our strategy. We continue to believe wealth management is one of the most attractive segments in financial services, notably in Asia Pacific, and ***we also expect to further expand the connectivity between our Investment Bank and the Wealth Management-related divisions***. Together, these initiatives should allow us to deliver on our medium-term ambition of an RoTE of 10% to 12% in a normalized environment, subject to market and economic conditions, ***while maintaining a strong balance sheet***."

44. On February 18, 2021, Credit Suisse issued press releases announcing its fiscal year 2020 ("FY20") and fourth quarter 2020 ("4Q20") financial results for the period ended December 31, 2020. Emphasizing the Company's "***[s]trong underlying performance positions bank to accelerate growth***," Credit Suisse "[r]eported 4Q20 pre-tax loss of CHF 88 mn, net revenues of CHF 5.2 bn," "[r]eported FY20 pre-tax income of CHF 3.5 bn, net revenues of CHF 22.4 bn, diluted earnings per share of CHF 1.06; and "FY20 adjusted pre-tax income, excluding significant items, of CHF 4.4 bn, up 6% versus 2019." The release further quoted defendant Gottstein, who highlighted the Company's purportedly robust business metrics and financial prospects and claimed that the Company's strong balance sheet continued supporting an increased dividend and massive stock buyback program, stating in pertinent part as follows:

**Thomas Gottstein, Chief Executive Officer of Credit Suisse Group AG, commented**: "Despite a challenging environment for societies and economies in 2020, ***we saw a strong underlying performance across Wealth Management and Investment Banking***, while addressing historic issues. We remained focused on

- 15 -

serving our clients around the globe and on delivering value to our shareholders. ***The steady execution of the strategic initiatives we announced last July supports our growth agenda and allows for further investment in our businesses***. Looking forward into 2021 and beyond, ***we aim to further accelerate growth in Wealth Management and deliver sustainable returns in Investment Banking***."

\*       \*       \*

**Strong capital position and disciplined capital distribution**:

- CET1 ratio of 12.9% as of the end of 2020

- Total capital distribution of ~ CHF 1 bn in 2020;

- Proposal to our shareholders to increase 2020 dividend by 5.4% vs 2019 (CHF 0.2926 per share)

- Started our share buyback program for 2021 in January, targeting a total of CHF 1.0 -1.5bn for the full year

\*       \*       \*

**OUTLOOK**

We would caution that the COVID-19 pandemic is not yet behind us and, notwithstanding the continued fiscal and monetary stimuli, the pace of recovery remains uncertain. ***Credit Suisse has seen a strong start to 2021, led by a substantial YoY increase in client activity***. Our Investment Bank is benefitting from a particularly strong performance in capital markets issuance activity and from a continued good performance across both Fixed Income and Equity Sales & Trading. This increase in client activity is also benefitting all three of our Wealth Management-related businesses, led by growth in APAC, while recurring commissions and fees are stable with higher assets under management offsetting the strengthening of the Swiss Franc. While net interest income remains lower than in 1Q20 due to interest rate reductions and the weaker US dollar, this impact is stabilizing sequentially and, assuming unchanged FX rates from current levels, we would expect this to improve as we plan to increase our lending volumes.

We remain fully focused on delivering ***outstanding products and services to our clients***, supporting them through the persisting COVID-19 pandemic and the resultant economic challenges. ***With the CET1 capital ratio at 12.9% as of the end of 2020, we continue to focus on deploying most of the marginal capital generated into Wealth Management as well as disciplined capital distribution based on dividend growth of at least 5% per annum, including a proposed dividend per share of 0.2926 in respect of the 2020 dividend, and an ongoing share buyback program of up to CHF 1.5 bn, with at least CHF 1.0 bn expected for 2021***.

(Footnotes omitted.)

- 16 -

45.     As to "[r]egulatory capital," the release stated that "[a]s of the end of 4Q20, our Bank for International Settlements (BIS) common equity tier 1 (CET1) ratio was 12.9% and our risk-weighted assets (RWA) were CHF 275.1 billion."  Further detailing these important metrics, the release stated in pertinent part as follows:

**Capital metrics**

*The CET1 ratio was 12.9% as of the end of 4Q20* compared to 13.0% as of the end of 3Q20.  Credit Suisse's tier 1 ratio was 18.6% as of the end of 4Q20 compared to 18.3% as of the end of 3Q20.  The total capital ratio was 19.0% as of the end of 4Q20 compared to 18.7% as of the end of 3Q20.

CET1 capital was CHF 35.4 billion as of the end of 4Q20, a 5% decrease compared to CHF 37.1 billion as of the end of 3Q20, mainly reflecting a negative foreign exchange impact and a net loss attributable to shareholders.  CET1 capital was also impacted by the reversal of unrealized gains on certain investments that are not eligible for CET1 recognition, a regulatory adjustment of defined benefit pension plan assets and the dividend accrual, partially offset by a regulatory adjustment of deferred tax assets.  Total eligible capital was CHF 52.2 billion as of the end of 4Q20, a 2% decrease compared to CHF 53.3 billion as of the end of 3Q20, mainly reflecting lower CET1 capital.

RWA was CHF 275.1 billion as of the end of 4Q20, a 4% decrease compared to CHF 285.2 billion as of the end of 3Q20.  Decreases in RWA were mainly related to foreign exchange movements, movements in risk levels in credit risk and internal model and parameter updates related to credit risk.  These decreases were partially offset by methodology and policy changes related to credit risk and movements in risk levels in market risk.  The movement in methodology and policy changes reflected the phase-in of certain Basel III revisions for credit risk, including SA-CCR for derivatives, mainly in International Wealth Management, equity investments in funds and central counterparty default fund contributions.

**Leverage metrics**

*The BIS tier 1 leverage ratio was 6.4% as of the end of 4Q20*, with a BIS CET1 component of 4.4%.

The leverage exposure was CHF 799.9 billion as of the end of 4Q20, a 3% decrease compared to CHF 824.4 billion as of the end of 3Q20.  The decrease in leverage exposure was mainly due to the decrease in the consolidated balance sheet due to the negative foreign exchange impact, partially offset by higher operating activities.  For 4Q20, the leverage exposure excluded CHF 110.7 billion of cash held at central banks, after adjusting for the dividend paid in 2020, as permitted by FINMA in response to the COVID-19 pandemic.

46.     Concerning the Company's "[s]hare buyback" and "[d]ividend proposal," the release

stated in pertinent part as follows:

> As announced on October 29, 2020, the Board of Directors approved an
> additional share buyback program for 2021 of up to CHF 1.5 billion. **We expect to
> buy back at least CHF 1.0 billion of shares in 2021**, subject to market and economic
> conditions.  We commenced the 2021 share buyback program on January 12, 2021
> and are acquiring our own shares on a second trading line on the SIX, subject to
> deduction of applicable Swiss federal withholding tax.  Shares repurchased in 2021
> are expected to be cancelled by means of a capital reduction to be proposed at a
> future AGM of shareholders.

*        *        *

> Our Board of Directors will propose to the shareholders at the AGM on April
> 30, 2021 a cash distribution of CHF 0.2926 per share for the financial year 2020.
> 50% of the distribution will be paid out of capital contribution reserves, free of Swiss
> withholding tax and will not be subject to income tax for Swiss resident individuals
> holding the shares as a private investment, and 50% will be paid out of retained
> earnings, net of 35% Swiss withholding tax.

47.     During a conference call held with stock analysts and investors that day, defendant

Gottstein emphasized the strength of his management, accountability to shareholders, transparency,

business metrics and financial prospects during his opening remarks, stating in pertinent part as

follows:

> **We entered 2021 with strong momentum, as evidenced by our best January
> in a decade**.  Pretax income for the month was up year-on-year across all divisions.
> Investment banking revenues are up substantially from the same period in 2020.
> Notwithstanding the fragility of the global economy due to the pandemic, **the growth
> strategy that I will discuss with you today puts us in an excellent position to build
> on our progress and to achieve our midterm ambitions that we set out at our
> investor update in December and which we reaffirm today**.

*        *        *

> At our investor update two months ago, I spoke about my personal priorities
> and the importance of dealing with legacies and **of accountability, which is one of
> the pillars of our refreshed code of conduct that we unveiled last month**.  Some of
> the cases I mentioned date back many years.  Nevertheless, these cases have affected
> our results in 2020.  In light of the COVID-19 situation and resulting economic
> environment and together with our assessment of shareholder returns in 2020, we
> have decided, with the approval of the Board of Directors, to lower our overall bonus

pool by 7% for 2020 compared to the previous year.  We are reducing short-term incentive awards for the Executive Board to an even greater extent.  ***This decision underscores to our employees, clients, shareholders and stakeholders that accountability and transparency are of the highest priority for us at Credit Suisse***. As you can see on the left side of the slide, we executed four strategic initiatives to support our growth agenda.   These refinements are expected to generate approximately CHF400 million and CHF450 million in savings per annum from 2022 onwards.  ***We are targeting growth investments of CHF300 million to CHF600 million in 2021 across Wealth Management and the Investment Bank***. This is accompanied by investments in relationship manager recruitment, ESG products and private markets.  We intend to invest most of our marginal capital generated into Wealth Management to deploy into lending.  In 2020, we made a total capital distribution of around CHF one billion through our 2019 dividend and 2020 share buyback.  ***Our strong capital position, a CET1 ratio of 12.9% at year-end 2020, allows us to invest and capture growth opportunities while providing attractive capital return through dividends and share buybacks***.

48.     Defendants' statements and omissions identified in ¶¶37-47, above, were materially false and misleading when made.  The true facts, which were known or recklessly disregarded by defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Credit Suisse's co-mingling of its lending, asset management, and private wealth management functions and imprudently aggressive pursuit of fees had materially diminished the Company's ability to properly assess and manage its own risk exposure to high-risk clients and potential liabilities from client losses;

(b)     Credit Suisse had ignored numerous red flags in connection with the Greensill funds, such as suspicious shipment activities during an internal compliance check, and overrode the concerns of the Company's in-house credit-structuring team in packing and selling billions of dollars' worth of Greensill-linked securities to investors;

(c)     Credit Suisse had conspired with Hwang to allow Archegos to covertly take on billions of dollars in excessively concentrated and risky positions by utilizing highly leveraged total return swaps, placing the risk of loss associated with these positions on Credit Suisse and its investors;

(d)     Credit Suisse was understating its exposure to risk and thus overstating its Tier 1 capital ratios in its public statements; and

(e)     Credit Suisse's internal controls were inadequate to ensure that the Company's potential liability to customers and losses arising from its exposure to customer losses were properly accounted for, managed and disclosed to investors.

49.     On March 1, 2021, Credit Suisse froze $10 billion in funds that were invested in Greensill's financial products and held by its supply-chain investment funds.

50.     Then, on March 8, 2021, Greensill filed for insolvency protection, as it found itself unable to repay a $140 million loan to Credit Suisse.  According to the *Financial Times*, more than 1,000 investors in the Greensill funds marketed were unable to exit their positions.

51.     By March 10, 2021, media reports revealed that Greensill investors had retained counsel and intended to sue Credit Suisse for their losses because Credit Suisse continued to market the biggest of the funds as a fully insured, low-risk product despite a decision by insurers during the summer of 2020 not to renew coverage.  Fremault, an attorney representing investors in the funds who had suffered losses of up to 60%, stated that the investors were reviewing their legal options, including potential lawsuits.  The fund in question, Credit Suisse (Lux) Supply Chain Finance Fund, was promoted as fully insured and this played a key part in the investors' decision to choose it as a safe option.  "Investors were not informed that the insurance companies decided during the summer 2020 that they would no longer insure the underlying receivables with effect as from March 1," Fremault said as reported by *Bloomberg News* on March 10, 2021.  The *Financial Times* has since reported that Greensill's collapse could cost Credit Suisse's clients billions of dollars in losses, leaving the Company exposed to immense potential liability.

52.     As the market digested this news, the market price of Credit Suisse ADRs collapsed from its close of $14.70 per ADR on March 1, 2021 to close at $12.85 per ADR by March 12, 2021, on unusually high volume, a decline of almost 13%.  However, because the full truth was not disclosed, the price of the ADRs remained artificially inflated.

53.     On March 16, 2021, Credit Suisse issued a press release attempting to downplay the severity of the Greensill debacle, while acknowledging that $10 billion of investor funds were at risk, stating in pertinent part as follows:

> *With regard to the suspension and liquidation of the supply chain finance funds (with an aggregate net asset value of approximately USD 10 billion as published in late February 2021) managed by Credit Suisse Asset Management (CSAM) with assets originated and structured by Greensill Capital, Credit Suisse's priority remains the recovery of funds for CSAM's investors*.  CSAM are working closely with the administrators of Greensill Capital, Grant Thornton, and with other parties to facilitate this process.  Initial redemption repayments totaling USD 3.1 billion across the four funds have been made beginning on March 8, 2021.  The funds' management companies intend to announce further cash distributions over the coming months, and we will update fund investors accordingly.  With respect to the collateralized USD 140 million bridge loan made by Credit Suisse to Greensill Capital last year, USD 50 million has been recently repaid by the administrators of Greensill Capital, reducing the outstanding collateralized loan to USD 90 million.  While these issues are still at an early stage, we would note that it is possible that Credit Suisse will incur a charge in respect of these matters.

54.     On March 18, 2021, Credit Suisse announced that, in light of the Greensill implosion and resulting legal, reputational and financial liability that had resulted, the Company had replaced its CEO of Asset Management and that the Asset Management business would be separated from the International Wealth Management division and managed as a new separate division.

55.     Also on March 18, 2021, Credit Suisse filed its FY20 Annual Financial Report with the SEC on Form 20-F which was signed and certified as to the Sarbanes Oxley Act of 2002 by defendants Gottstein and Mathers.  As to Credit Suisse's Tier 1 capital ratios and ability to increase the dividend and continue the stock buyback program, the Form 20-F stated in pertinent part as follows:

**Creating value for shareholders**

*In keeping with our intention to increase the ordinary dividend per share by at least 5% per annum*, the Board of Directors will propose a cash distribution of CHF 0.2926 per share for the 2020 financial year to shareholders at the Annual General Meeting on April 30, 2021.  Half of the distribution will be paid out of capital contribution reserves, free of withholding tax and not subject to income tax for Swiss resident individuals who hold the shares as a private investment; the remaining half will be paid out of retained earnings, net of 35% Swiss withholding tax.

\*       \*       \*

Our share buyback program for 2021, through which *we intend to buy back shares amounting to at least CHF 1.0 billion with an upper limit of CHF 1.5 billion*, subject to market and economic conditions, kicked off in January.  The shares bought back in 2021 are expected to be cancelled via a capital reduction, in line with a resolution expected to be passed at a later Annual General Meeting.

**Resilient business model generates capital**

*Our resilient diversified business model allows us to continue to generate capital*.  Already at the end of 2019, our capital and leverage ratios met the Swiss regulatory requirements that took effect in 2020.  *We strengthened our capital base once again last year.  This is reflected in our common equity tier 1 (CET1) ratio, which rose from 12.7% at the end of 2019 to 12.9% at the end of 2020*.

Reflecting the fourth quarter results, the Group's Return on Tangible Equity (RoTE)\*\* declined to 6.6% for the full year 2020.  For the first nine months of 2020, this figure stood at 9.8%, higher than the 8.7% reported for the full year 2019.  *We are maintaining our medium-term RoTE\*\* target of 10-12%*, in a normalized environment and subject to market and economic conditions.  Diluted earnings per share for 2020 amounted to CHF 1.06, compared to CHF 1.32 for 2019, while the tangible book value per share\*\* remained stable at CHF 15.80 at the end of 2020, compared to CHF 15.88 at the end of 2019.

56.     On Friday, March 26, 2021, several of the large banks offering prime brokerage services to Archegos – including Morgan Stanley, Goldman Sachs and UBS – suddenly began liquidating billions of dollars' worth of shares that Archegos had swap positions on at fire sale prices after Archegos had failed to meet a margin call.  By the time Credit Suisse tried to liquidate its own holdings of stocks underlying Archegos' swap contracts over the ensuing weekend, prices had already collapsed and Credit Suisse quickly racked up billions of dollars in losses.

57.     After the market price of Credit Suisse ADRs plunged between Friday, March 26 and Monday, March 29, 2021 on this news, Credit Suisse issued a press release on March 29, conceding that "the loss resulting from this exit . . . could be highly significant and material to our first quarter results."  The *Financial Times* then pegged Credit Suisse's estimated losses at between $3 billion and $5 billion, more than a year's worth of the Company's net profit.

58.     On March 30, 2021, the SEC summoned all of the banks embroiled in the Archegos affair, then being called "one of the biggest fund blowups in years."  S&P Global Ratings downgraded Credit Suisse's corporate debt rating that day to negative from stable, substantially increasing the Company's costs of capital.  S&P's press release stated in pertinent part that "[i]n our view, there is a meaningful risk that clarification of the reasons for a potential material loss related to a single client may reveal deficiencies in Credit Suisse group's risk management system or a risk appetite that is not commensurate with the current ratings."  The report added that, "[a]s a result of its investment banking and asset management activities, Credit Suisse's risk profile remains complex and entails financial and nonfinancial risks."  S&P further lamented that "[m]anagement of its relationships with the U.S. hedge fund and Greensill group also has potential to damage the bank's reputation, which was already tarnished following high-profile governance issues in 2020 and culminated with its CEO's departure," referring to defendant Gottstein's predecessor as CEO stepping down after a high-profile corporate espionage scandal.

59.     As reported by *The Wall Street Journal* on March 31, 2021, Credit Suisse "had a core capital buffer of 12.9% at year-end" and "[i]f the Archegos hit is $4 billion, that ratio could fall by roughly 1 percentage point to well below the 12.5% minimum targeted by the lender."  According to *The Wall Street Journal*, even if the Company's capital ratios remain high enough to preclude its a

need to raise additional capital, Credit Suisse "[s]hareholders can expect *a suspension of its share buyback program* at the least."

60.    The market price of Credit Suisse ADRs fell another nearly 20% on this news, declining from a close of $13.21 per ADR on March 25, 2021 to close at $10.60 per ADR on March 31, 2021, on unusually high trading volume.

61.    On April 6, 2021, Credit Suisse revealed that it would record a charge of 4.4 billion francs ($4.7 billion) in the first quarter 2021 on the Archegos losses, resulting in a 900 million franc loss for the first quarter 2021.  The Company also disclosed that Brian Chin, the CEO of its Investment Bank, and defendant Warner, its Chief Risk and Compliance Officer, were stepping down immediately.  Critically, Credit Suisse slashed its dividend by two-thirds to 0.10 francs per share and halted its plan to resume share buybacks.  The Company also launched separate external investigations into both the Archegos and Greensill debacles and a "tactical crisis committee" to deal with the fallout.

62.    On April 8, 2021, *The Wall Street Journal*, in a report entitled "Credit Suisse Ignored Warnings Before Archegos and Greensill Imploded," reported that Credit Suisse executives had long known about the excessive risks posed by the Company's Archegos and Greensill investments, but failed to disclose these facts to investors.  For example, the report stated that Credit Suisse had ignored serious red flags, including concerns that Greensill was taking operational shortcuts, the firing of an employee working with Greensill, and suspicious shipments identified in an internal audit, when marketing its Greensill-linked funds to investors.

63.    On April 13, 2021, Credit Suisse provided an update on the Company's Greensill funds.  The update stated that the cash position of the funds only stood at $5.4 billion, out of an

initial $10 billion.  The Company also acknowledged $2.3 billion worth of problematic loans in its Greensill funds.

64.     As a result of defendants' false statements, Credit Suisse ADRs traded at inflated prices during the Class Period.  However, after the above revelations seeped into the market, the price of the Company's ADRs was hammered by massive sales, sending it down nearly 30% from its Class Period high.

## ADDITIONAL SCIENTER ALLEGATIONS

65.     As alleged herein, Credit Suisse and the Individual Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Suisse, their control over, and/or receipt and/or modification of Credit Suisse's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Credit Suisse, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

66.     The "Safe Harbor" warnings accompanying Credit Suisse's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC

on Form 6-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

67.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Credit Suisse who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### LOSS CAUSATION AND ECONOMIC LOSS

68.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Credit Suisse ADRs and operated as a fraud or deceit on purchasers of Credit Suisse ADRs.  As detailed above, when the truth about Credit Suisse's misconduct was revealed, the value of Credit Suisse ADRs declined precipitously as the prior artificial inflation no longer propped up the ADR price.  The decline in the price of Credit Suisse ADRs was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the ADR price decline negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Credit Suisse ADRs and the subsequent significant decline in the

value of Credit Suisse ADRs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

69.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Credit Suisse's business, operations and financial results as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Credit Suisse ADRs to be artificially inflated.  Plaintiff and other Class members purchased Credit Suisse ADRs at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

70.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

71.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Credit Suisse ADRs was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     Credit Suisse ADRs met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient market;

(b)     Credit Suisse regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     Credit Suisse was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

72.     As a result of the foregoing, the market for Credit Suisse ADRs promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the ADRs.  Under these circumstances, all those who transacted in Credit Suisse ADRs during the Class Period suffered similar injury through their transactions in Credit Suisse ADRs at artificially inflated prices and a presumption of reliance applies.

73.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Credit Suisse ADRs between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Credit Suisse ADRs, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Credit Suisse ADRs during the Class Period.  Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their

immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

75.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Credit Suisse ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

76.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and management of Credit Suisse; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

79.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

80.     Plaintiff incorporates ¶¶1-79 by reference.

81.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Credit Suisse ADRs during the Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Credit Suisse ADRs.  Plaintiff and the Class would not have purchased Credit Suisse ADRs at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

84.     Plaintiff incorporates ¶¶1-83 by reference.

85.     The Individual Defendants acted as controlling persons of Credit Suisse within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Credit Suisse stock, the Individual Defendants had the power and authority to cause Credit Suisse to engage in the wrongful conduct complained of herein.  Credit Suisse controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23 and appointing plaintiff as a lead plaintiff and approving its selection of lead counsel;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff's reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 16, 2021                    ROBBINS GELLER RUDMAN & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         MARY K. BLASY


                                         *s/ Samuel H. Rudman*
                                         ─────────────────────────
                                         SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)

                                         ROBBINS GELLER RUDMAN & DOWD LLP
                                         BRIAN E. COCHRAN
                                         200 South Wacker Drive, 31st Floor
                                         Chicago, IL 60606
                                         Telephone:  312/674-4674
                                         312/674-4676 (fax)

                                         VANOVERBEKE, MICHAUD & TIMMONY,
                                           P.C.
                                         THOMAS C. MICHAUD
                                         79 Alfred Street
                                         Detroit, MI  48201
                                         Telephone:  313/578-1200
                                         313/578-1201 (fax)

                                         Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF ST. CLAIR SHORES POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such

CREDIT SUISSE

reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _16_ day of April, 2021.

CITY OF ST. CLAIR SHORES POLICE AND
FIRE RETIREMENT SYSTEM

By: _____

Its: _____
JAMES E HADDAD

- 2 -

## SCHEDULE A

### SECURITIES TRANSACTIONS

**ADR**

| Date<br>**Acquired** | Amount of<br>**Shares Acquired** | **Price** |
|---|---|---|
| 12/23/2020 | 1,895 | $12.73 |
| 01/28/2021 | 3,435 | $13.57 |
| 03/17/2021 | 3,804 | $12.93 |
| 03/25/2021 | 2,080 | $13.04 |

Prices listed are rounded up to two decimal places.