UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x
CITY OF ST. CLAIR SHORES POLICE AND :   Civil Action No. 1:21-cv-03385-NRB
FIRE RETIREMENT SYSTEM, Individually : 
and on Behalf of All Others Similarly Situated, :   <u>CLASS ACTION</u>
                                   : 
                 Plaintiff, :   AMENDED COMPLAINT FOR
                                    :   VIOLATIONS OF THE FEDERAL
        vs. :   SECURITIES LAWS
                                    : 
CREDIT SUISSE GROUP AG, THOMAS : 
GOTTSTEIN, DAVID R. MATHERS, LARA : 
J. WARNER and BRIAN CHIN, : 
                                    : 
                 Defendants. : 
——————————————————— x   <u>DEMAND FOR JURY TRIAL</u>

**TABLE OF CONTENTS**

**Page**

I.     NATURE OF THE ACTION ..................................................................................1

II.    JURISDICTION AND VENUE .........................................................................3

III.   THE PARTIES..................................................................................................4

IV.  DEFENDANTS SIDELINE RISK MANAGEMENT TO MAKE MORE
MONEY ...........................................................................................................5

      A.     Credit Suisse's Past Revenue "[A]t [A]ll [C]osts" Approach to Risk
Management "Ha[d] to Change" ..............................................................5

      B.     Publicly, Credit Suisse Highlights Its "Three Lines of Defense" and "Risk
Constraints" as Evidence that It Has Changed ........................................6

      C.     Privately, Credit Suisse Reverts to a "Culture of Risk" that Cannot "Say
'No' to the Business"................................................................................8

      D.     In March 2020, Risk Management Failures Cause $214 Million in Losses,
Trigger an Audit "Demanded" by the Board and Highlight Customers
"Beyond Full" of Their Risk Limits ........................................................9

V.    DEFENDANTS FRAUDULENTLY COVER UP PERVASIVE RISK LIMIT
BREACHES ...................................................................................................11

      A.     The October 29, 2020 Internal Audit Report and Regular Updates from the
Audit "Demanded" by the Board ...........................................................11

            1.     Systemic Risk Limit Breaches and Governance Failures .........................11

            2.     The Audit Team Gives the Risk Function a "C-" and, in Effect,
Puts the Risk Function on Probation.........................................................14

            3.     Defendants' Access to the October 29, 2020 Audit Report, Regular
Update Reports and Other Facts Show Scienter ........................................15

      B.     Defendants' October 29, 2020 Materially False and Misleading Statements
About Credit Suisse's Purported Risk Management Policies and Practices..........19

            1.     "Credit Limits" as "Primary Risk Controls" to "Prevent Undue
Risk Concentrations" ...............................................................................19

**Page**

      2.    "Risk Appetite Framework" – "Risk Limits Are Binding Thresholds" .................................................................................20

      3.    "Risk Coverage and Management" – "Current Market Conditions" .........23

C.    Defendants' November 23, 2020 Misstatements ...................................................24

      1.    "Credit Exposure Is Monitored Daily to Ensure It Does Not Exceed the Approved Credit Limit" ..............................................24

      2.    "Credit Limits" Serve to "Prevent Undue Risk Concentrations" Within "Rigorous Credit Quality Monitoring" ..........................................26

D.    The December 10, 2020 Board Meeting Materials' "Passing" Update on Archegos and "Numerous Other Counterparties"...................................................27

E.    Defendants' December 15, 2020 Statements Were Materially False and Misleading ..........................................................................................................28

      1.    Gottstein Highlights "Holistic Client Oversight" and "Rigorous Credit Standards" ...................................................................28

      2.    Chin Highlights "Effective" Risk Management, Prioritizing Controls ......................................................................................30

F.    Defendants Highlight Their Risk Limits as Conditions Deteriorate.....................32

      1.    On February 18, 2021 and March 18, 2021, Gottstein and Mathers Essentially Repeat Their False and Misleading Risk Management Statements ..................................................................33

      2.    On March 18, 2021, Mathers and Warner Repeat Their Previous False and Misleading Statements, Again Assuring Investors that "Credit Limits" "Are Not "Exceed[ed]" ....................................................34

VI.    LOSS CAUSATION/ECONOMIC LOSS ........................................................................34

VII.    NO SAFE HARBOR ....................................................................................................37

VIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE .............................................38

IX.    CLASS ACTION ALLEGATIONS ...............................................................................39

**Page**

COUNT I For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All
Defendants ................................................................................................40

COUNT II For Violation of §20(a) of the 1934 Act Against All Defendants ...........................41

PRAYER FOR RELIEF ....................................................................................................41

JURY DEMAND ..............................................................................................................42

Lead Plaintiff Sheet Metal Workers Pension Plan of Northern California ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on the investigation undertaken by counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Credit Suisse Group AG ("Credit Suisse," "CSg" or the "Company"), Company press releases, conference call transcripts and media reports about the Company.  Lead Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Credit Suisse American Depositary Receipts ("ADRs") between October 29, 2020 and March 31, 2021, inclusive (the "Class Period"), against Credit Suisse and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Credit Suisse is a global financial services company based in Zurich, Switzerland.  It has branch offices in the United States and around the globe, and its ADRs are listed and traded on the New York Stock Exchange ("NYSE").

3.      This case involves a kind of high-finance game of Russian roulette that Credit Suisse played, concealed from the investing public, and lost.  Credit Suisse had recently been known as one of the riskier banks until it started highlighting a core commitment to risk management – one of the recently appointed Chief Executive Officer's ("CEO") "core beliefs," as he put it.  Unbeknownst to investors, however, Credit Suisse routinely allowed hedge funds and other "prime" customers to make risky, multi-billion-dollar bets on credit – Credit Suisse's credit – despite the fact that those customers violated and flouted one of the core elements of the Company's risk management

- 1 -

framework – so-called risk "limits." Credit Suisse's laissez-faire approach to risk management ultimately led to at least $5.5 billion in losses on bets gone sour between the Company and one of its largest hedge fund customers – a customer that had repeatedly breached the Company's risk limits by hundreds of millions of dollars.

4.      Yet Defendants repeatedly highlighted their self-described rigorous risk management to the investing public. For example, Defendants assured the investing public that they only engaged in "[p]rudent risk-taking" and had established "credit limits" as one of the "core elements" of the Company's credit risk management ("CRM") framework "to serve as primary risk controls on exposures and to prevent undue risk concentrations." *Infra*, §V.B.1. They told investors that their risk "[l]imits are binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs." *Infra*, §V.B.2. They stated that Credit Suisse had a "rigorous credit quality monitoring process" and that "[c]redit exposure is monitored daily to ensure it does not exceed the approved credit limit." *Infra*, §V.C.1. Defendants made other similar statements throughout the Class Period.

5.      These statements to the investing public were all materially false and misleading at the time they were made, as Defendants knew or should have known by October 2020. Approximately seven months earlier, one of Credit Suisse's numerous hedge fund customers had collapsed, causing the Company $214 million in losses – losses the Company did not disclose at that time, in March 2020. Privately, however, the $214 million loss caused the Company's board of directors to "demand" an audit. The results of the audit began to surface in September 2020 – followed by a full audit report that was "released" internally on October 29, 2020 – followed by still more "regular" updates. The audit results were clear: Credit Suisse's risk management function received a "C-" for allowing the Company's lucrative hedge fund clients to flout – on a routine,

systematic basis – the risk "limits" Credit Suisse highlighted to the investing public.  The audit found that Credit Suisse had permitted over *1,000* risk limit breaches to persist.  The breaches were not small; to the contrary, Credit Suisse allowed a single customer to run up hundreds of millions of dollars' worth of risk limit breaches, and that one customer was just an example.

6.      Credit Suisse's systemic credit risk deficiencies exposed its investors to a high-risk game that was going to end badly sooner or later.  In March 2021, one of the Company's many risk-breaching customers collapsed, revealing the Company's prior risk management statements to be materially false and misleading and causing an ADR price decline of more than 17% in a matter of days.

## II.     JURISDICTION AND VENUE

7.      Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

8.      Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  Credit Suisse has offices in this District, and many of the acts and transactions giving rise to the violations of law complained of occurred here.  In addition, Credit Suisse ADRs are listed and trade on the NYSE, a national stock market based in this District.

### III.    THE PARTIES

9.    Lead Plaintiff Sheet Metal Workers Pension Plan of Northern California purchased Credit Suisse ADRs during the Class Period, as set forth in the certification previously filed with the Court (ECF No. 23-2) and incorporated herein by reference, and was damaged thereby.

10.    Defendant Credit Suisse is a global financial services company.  Credit Suisse is based in Zurich, Switzerland, and has branch offices in the United States and around the globe.  Its ADRs, each representative of one share of Credit Suisse common stock, trade on the NYSE under the ticker symbol "CS."  The ADRs at issue are "sponsored" by Credit Suisse.

11.    There are four individual defendants: (a) Thomas Gottstein ("Gottstein"), who served as CEO of Credit Suisse at all relevant times; (b) David R. Mathers ("Mathers"), who served as Chief Financial Officer ("CFO") of Credit Suisse at all relevant times; (c) Lara J. Warner ("Warner"), who served as Chief Risk and Compliance Officer ("CRCO") of Credit Suisse at all relevant times until she was fired in or about April 2021; and (d) Brian Chin ("Chin"), who served as CEO of Credit Suisse's investment banking division at all relevant times until he was fired in or about April 2021.  Defendants Gottstein, Mathers, Warner and Chin are collectively referred to herein as the "Individual Defendants."  Credit Suisse and the Individual Defendants are collectively referred to herein as the "Defendants."

12.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Credit Suisse's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors – *i.e.*, the market.  As detailed herein, they were provided with copies of certain reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with

the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or should have known that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## IV.   DEFENDANTS SIDELINE RISK MANAGEMENT TO MAKE MORE MONEY

### A.   Credit Suisse's Past Revenue "[A]t [A]ll [C]osts" Approach to Risk Management "Ha[d] to Change"

13.   Credit Suisse's investors have suffered losses occasioned by a number of high profile risk management failures in the past.  To cite but two of many examples, the risk function failed to prevent the Company from criminally assisting U.S. tax cheats, resulting in a criminal guilty plea by the Company and a $2.6 billion penalty; and it failed to prevent the Company's investment banking business from systematically violating the U.S. securities laws while peddling subprime mortgage securities – ultimately resulting in a $5.28 billion penalty.[1]

14.   In 2015, the Company's board of directors hired CEO Tidjane Thiam ("Thiam") to clean up the bank.  "He had been hired in 2015 to carve out areas of the bank where the potential volatility and losses were too high.  A related task was to reshape a culture that allowed Credit Suisse to become one of the most heavily fined banks in the world."[2]  Thiam conceded in 2016 that the pursuit of revenue "'at all costs'" previously drove Credit Suisse's business teams to make risky

---

[1]   *See* Trefis Team, *Credit Suisse Pleads Guilty, Pays $2.6 Billion to Settle U.S. Tax Evasion Charges*, Forbes (May 20, 2014, 1:39 pm EDT); Press Release, Department of Justice, *Credit Suisse Agrees to Pay $5.28 Billion in Connection with its Sale of Residential Mortgage-Backed Securities* (Jan. 18, 2017).

[2]   *See* Margot Patricia & Kosaku Narioka, *Archegos Blowout Heaps Pressure on Credit Suisse*, Wall St. J. (Mar. 30, 2021).

bets that sidelined Credit Suisse's risk management team: "'It's unfortunate'" – he said – "'And I think it's also indicative of an attitude to risk that has to change.'"[3]

**B.      Publicly, Credit Suisse Highlights Its "Three Lines of Defense" and "Risk Constraints" as Evidence that It Has Changed**

15.     When defendant Gottstein took over the CEO role in February 2020, he wasted no time in assuring investors that he would continue pursuing sound risk management. Gottstein told investors in an annual report in March 2020 that:

> The most important lesson learned from the financial crisis at the end of the last decade was the need to strengthen the resilience of banks. Here at Credit Suisse, this includes the Compliance and Risk Management functions, which have been significantly expanded in recent years, as well as the need for a solid capital position, which is an area that we have successfully addressed.[4]

That same report devoted over 40 pages to highlighting the Company's risk management functions and governing constraints. *Id.* at 135-76.

16.     The fundamental limit on the Company taking risky bets was its purported risk constraints: "We maintain a comprehensive Group-wide risk appetite frame-work, which is governed by a global policy and provides a robust foundation for risk appetite setting and management across the Group." *Id.* at 140. "The size of our risk profile is restricted to the planned level of our risk appetite through the use of risk constraints, such as limits, guide-lines, tolerances and targets." (*id.*):

---

[3]    *See* Chad Bray & Liz Moyer, *Credit Suisse Chief Says Risky Bets Were a "Surprise*," N.Y. Times (Mar. 23, 2016).

[4]    March 25, 2020 Form 20-F, 2019 Annual Report at 9.

**Risk appetite framework – key definitions**



**Risk capacity** Maximum level of risk that we can assume given our current level of resources before breaching any constraints determined by capital and liquidity requirements, the operational environment and our responsibilities to depositors, shareholders, investors and other stakeholders.

**Risk appetite** Aggregate level and types of risk we are willing to assume within our risk capacity to achieve our strategic objectives and business plan.

**Risk profile** Point-in-time assessment of our net risk exposures aggregated within and across each relevant risk category and expressed in a variety of different quantitative risk metrics and qualitative risk observations.

**Risk constraints** Quantitative and qualitative measures based on forward-looking assumptions that allocate our aggregate risk appetite to businesses, legal entities, risk categories, concentrations and, as appropriate, other levels.

17.      Because risk constraints are not self-enforcing, Credit Suisse assured investors that it had not one, but three, lines of defense to ensure enforcement: "The Group's risk governance framework is based on a 'three lines of defense' governance model, where each line has a specific role with defined responsibilities and works in close collaboration to identify, assess and mitigate risks." *Id.* at 137.

18.      Credit Suisse's stated three lines of defense – *i.e.*, the actual means of enforcing its stated risk constraints – depended on the relevant business, the risk function and the audit function. The "first line" of defense was embedded in the front office (*i.e.*, the Company's customer-facing business) that was responsible for "pursuing suitable business opportunities" (*id.*), including the investment banking division's business of catering to wealthy institutions, individuals and hedge funds – known as "Prime Services." The "second line" of defense included the risk function known as CRM, which was nominally "responsible for reviewing, measuring and challenging front office activities and for producing independent assessments and risk reporting for senior management and regulatory authorities." *Id.* The "third line" of defense was the Company's "Internal Audit"

function, which was supposed to monitor "the effectiveness of controls across various functions and operations, including risk management and governance practices." *Id.*

### C.   Privately, Credit Suisse Reverts to a "Culture of Risk" that Cannot "Say 'No' to the Business"

19.    Defendant Gottstein moved Credit Suisse in the direction of revenue at any cost, notwithstanding the Company's many public statements to the contrary.  Six current and former Credit Suisse managers recounted how Gottstein hollowed out risk expertise: "'There was a dulling of the senses,'" according to one former executive.[5]  "'Credit Suisse was in the deep end swimming with the sharks . . . .  They were always going to get destroyed.'"  *Id.*

20.    For example, Gottstein promoted defendant Warner in summer 2020 because she was willing to make the Company's risk function "'more commercial'" and "'aligned'" with the front office traders and dealmakers, as Credit Suisse personnel told the *Financial Times*. *Id.*  According to *Bloomberg*, "She challenged her managers to stop thinking only about defending the bank's capital and start considering other business priorities."[6]  She fired senior risk managers, prompting one witness to say: "'When you bring in a sense of fear into an organization by removing so many people, the culture of the risk is not to say "no" to the business anymore.'"[7]

21.    Consequently, Credit Suisse took on greater exposure to bets by its risky hedge fund clients.  Hedge funds generally borrow money – via margin trading or the like – to increase returns through financial leverage.  Hedge funds are generally seen as "compelling prospective client[s] by

---

[5]   *See* Stephen Morris, et al., *How Credit Suisse rolled the dice on risk management – and lost*, Financial Times (Apr. 19, 2021).

[6]   Patrick Winters & James Hertling, *Two Blowups Have Credit Suisse Paying the Price of Risky Business*, Bloomberg (Apr. 22, 2021).

[7]   *See* Stephen Morris, et al., *How Credit Suisse rolled the dice on risk management – and lost*, Financial Times (Apr. 19, 2021).

prime brokers, the potentially lucrative but risky division of investment banks that loan[] cash and securities to hedge funds and processes their trades."[8] "The fee-hungry investment banks," such as Credit Suisse, "were ravenous for [hedge fund] trading commissions and desperate to lend [hedge fund traders] money so [they] could magnify [their] bets." *Id.* Though Credit Suisse was ravenous for that kind of revenue, the Company started to face the consequences of undermining its risk management framework during the run-up to, as well as during, the Class Period.

> **D.    In March 2020, Risk Management Failures Cause $214 Million in Losses, Trigger an Audit "Demanded" by the Board and Highlight Customers "Beyond Full" of Their Risk Limits**

22.    In March 2020, for example, one of the hedge funds that Credit Suisse courted – Malachite Capital – collapsed, triggering $214 million in losses to the Company.[9]  Three Credit Suisse boards (the Company's board, as well as the boards of its U.S. and U.K. subsidiaries) demanded an audit to determine the underlying causes, which, in turn, led to an across-the-board audit of the investment bank's exposure to all counterparty credit risk.  *Id.*

---

[8]    Tabby Kinder & Leo Lewis, *How Bill Hwang got back into banks' good books – then blew them up*, Financial Times (Mar. 29, 2021).

[9]    Credit Suisse Group Special Committee of the Board of Directors Report on Archegos Capital Management by Paul, Weiss, Rifkind, Wharton & Garrison LLP ("PW Report") at 90 ("Following Malachite's [March 2020] collapse, [Credit Suisse]'s Board (and the boards of [Credit Suisse]'s U.K. and U.S. subsidiaries) demanded an investigation and prompt remediation."); *accord id.* at 81 n.80 ("In 2020, as a consequence of the [March 2020] Malachite default, the CS Board directed [Internal Audit] to conduct additional audits, including an audit of CRM's oversight of counterparty credit risk within [investment bank] trading products."); *see also* 2020 Credit Suisse International ("CSi") Annual Report at 2 (Mathers on investment bank's U.K. subsidiary board in 2020); *see also* Commonwealth of Massachusetts Secretary of State Filings (Chin on investment bank's U.S. subsidiary board in 2020).  Chin also was involved in the Internal Audit investigation as CEO of the investment bank.  *See* PW Report at 90 (the "[investment bank] CEO asked [Internal Audit] to perform a 'high-level review' of the incident 'to identify root causes of the incident and potential lessons learned'").

23.     The audit launched in March 2020 implicated the Company's so-called "first line of defense" (*i.e.*, the risk function embedded in each business unit) and the so-called "second line of defense," CRM.[10]  Among other things, the audit revealed that the Company's investment banking division and CRM (which oversaw both the investment bank and the Company's other business units) were permitting Credit Suisse clients to violate established risk limits.

24.     During a September 2020 meeting relating to the counterparty credit risk audit, CRM personnel discussed the "scenario exposure"[11] and the "[potential exposure] limit" breaches that had occurred, including those in the Archegos hedge fund.[12]  Archegos is a family office investment fund run by Sung Kook (also known as "Bill") Hwang ("Hwang").[13]  Credit Suisse's involvement with Archegos began in 2003 when a predecessor fund, Tiger Asia Management, LLC ("Tiger Asia"), became a client of Credit Suisse.  PW Report at 55.  The Archegos hedge fund was identified at the meeting as one exemplar client that CRM had allowed to breach the Company's stated risk limits.  By September 2020, Archegos had been in breach of the Company's established potential exposure limit – by approximately $100 to $500 million – for about five months.  For example, at the end of

---

[10]    *See infra*, §IV.B (Credit Suisse's self-described lines of defense).

[11]    "Scenario exposure" is the output of a credit risk model that simulates the value of a portfolio based on, for example, a 20% decline in securities markets.  Scenario limits are "'the maximum exposure [Credit Suisse] and individual [Credit Suisse] legal entities are willing to accept in [the] stress situation[s].'"  PW Report at 47-48.

[12]    "Potential exposure" refers to "'the risk that a counterparty will default on its obligation to [Credit Suisse] before settlement'" – which was the primary risk metric Credit Suisse used internally to monitor counterparty credit exposure.  PW Report at 47.  The potential exposure of a counterparty's portfolio of transactions "'refers to an exposure profile measured with regard to a certain confidence level'" (*i.e.*, degree of certainty).  *Id.*  For counterparty credit risk exposures that, like Archegos, "'arise in the context of trading financial instruments,'" Credit Suisse calculated potential exposure to the 95% confidence level.  *Id.*

[13]    Hwang has a questionable trading record.  *See, e.g.*, Press Release, SEC, *Hedge Fund Manager to Pay $44 Million for Illegal Trading in Chinese Bank Stocks* (Dec. 12, 2012).

August 2020, Archegos was in breach of Credit Suisse's potential exposure limit by approximately $375 million.[14]  Archegos was repeatedly in breach of another risk limit – the scenario exposure limit – by similar amounts, including up to and above $600 million.[15]  Internal CRM communications during this time corroborate that Archegos was "'beyond full'" of the Company's established risk limits.[16]

## V.   DEFENDANTS FRAUDULENTLY COVER UP PERVASIVE RISK LIMIT BREACHES

### A.   The October 29, 2020 Internal Audit Report and Regular Updates from the Audit "Demanded" by the Board

#### 1.   Systemic Risk Limit Breaches and Governance Failures

25.    "Lengthy, un-remediated limit breaches were not unique to Archegos."[17]  On October 29, 2020, the Company's Internal Audit group completed a report on the investment bank's exposure to counterparty credit risk.  The audit report revealed pervasive risk limit breaches.

26.    The October 29, 2020 audit report gave the Company's core credit risk function that oversaw counterparty credit risk exposure – the CRM group – a "'*C-*'" grade with regard to the "overall counterparty credit risk control environment."[18]  The audit found 1,004 open risk limit breaches that CRM had neither elevated – despite receiving breach reports on a weekly basis[19] – nor remedied; in particular, the audit found: (1) "180 active (*i.e.*, caused by new trading or collateral

---

[14]   PW Report at 79 (chart); *id.* at 93 (August potential exposure of $395 million).

[15]   *Id.* at 85 (chart).

[16]   *Id.* at 85.

[17]   *Id.* at 81 n.80.

[18]   *Id.* at 54.

[19]   *Id.* at 54 n.37.

activity) open limit excesses with an average age of 47 days"; and (2) "824 passive (*i.e.*, breach due to market events) open limit excesses with an average age of 100 days."[20]

27.    The October 29, 2020 audit report made other findings that apply to the CRM function as a whole: (1) insufficient consideration of "'early warnings of potential distress'" and warnings of market volatility (such as scenario exposure reaching full capacity or potential exposure limit breaches); (2) ineffective controls to assess scenarios when the use of standard scenarios did not capture the idiosyncratic risk of particular hedge fund clients; (3) insufficient margin due to the use of static, rather than dynamic, margining;[21] (4) unclear ownership of roles and responsibilities in the event of default, which hindered transparency and timely escalation of events; and (5) a fragmented and manual crisis management process, which in turn drove a slow management response.[22]

28.    Risk limit breaches by Archegos were among the 1,004 breaches identified in the October 29, 2020 audit report. The following charts illustrate Archegos' breaches of Credit Suisse's risk limits:

---

[20]    *Id.* at 54.

[21]    "Dynamic margining" is a method of calculating margin requirement rates for open positions based on the size of the exposure and whether or not any of the position is hedged. By contrast, "static margining" involves setting a fixed margin requirement at the outset of the contract. A dynamic margin requirement would generally require clients to post more collateral as a position moves down and would increase the costs for hedge funds and family offices looking to use swap agreements, making the trades less profitable. *See* Matthew Fox, *Credit Suisse reins in hedge-fund limits following $4.7 billion loss tied to Archegos Capital, report says*, Business Insider (Apr. 9, 2021).

[22]    PW Report at 152.

[Potential Exposure] Breaches



[Scenario Exposure] Breaches



29.     The potential exposure breaches are illustrated by the values above the $20 million level from January 2020 through February 2021; the scenario exposure breaches are illustrated by the values above the $250 million level during the same time period.[23]

**2.     The Audit Team Gives the Risk Function a "C-" and, in Effect, Puts the Risk Function on Probation**

30.     Credit Suisse's Internal Audit function – following orders from the highest governing body at Credit Suisse, its board of directors – was clearly justified in giving the Company's CRM

---

[23]     Credit Suisse's CRM function – the one at issue in the October 29, 2020 audit report and subsequent, regular updates to the Company's board – raised Archegos' risk breach limits from $250 million to $500 million in February 2021.  *Id.* at 106.  Archegos still breached those limits.

function a grade of "C-," which was slightly above the lowest possible grade, a "D." The "C-" grade effectively put CRM into a probationary period that the Company called a "Remediation Period."[24] CRM was never released from probation at any relevant time.

31.     During CRM's remediation period, the Company's auditors "regularly updated" the board about pervasive risk limit breaches.[25] Those updates demonstrated that CRM failed to remedy pervasive risk limit breaches.  In particular, the CRM committee created for the purpose of reviewing credit limit breaches did not even "discuss" Archegos – one of the largest breaching customers – "for nearly six months" following a September 2020 meeting about Archegos and similar counterparties.[26] Because CRM failed to remedy outstanding risk limit breaches, and because the audit function uncovered those facts in the run-up to issuing its October 29, 2020 report, it is reasonable to infer that the audit function reported to the board, in substance, that CRM was failing to remedy the pervasive risk limit breaches.  The circumstances surrounding a December 2020 board meeting further support this conclusion.  *Infra*, ¶¶57, 60.

### 3. Defendants' Access to the October 29, 2020 Audit Report, Regular Update Reports and Other Facts Show Scienter

32.     In addition, the following facts support a compelling inference that the Individual Defendants and others received the October 29, 2020 audit report and relevant updates.  At the very

---

[24]   *See* Internal Audit Charter of Credit Suisse Group AG at 11 ("Finally, for C and D rated Audit Reports, a Remediation Period rating is assigned to the audit report indicating an estimate of the time required to return the audited area to a B-rated control environment – for A and B rated reports this is not applicable.").

[25]   PW Report at 14 ("[Credit Suisse] also took a number of steps to ensure that the Equity Derivatives business did not have other clients with profiles similar to Malachite (the business concluded none existed), ***broadened the universe*** of audits to be performed by [Internal Audit] ***(including an audit on counterparty credit risk), and regularly updated the Board*** on remedial measures relating to the Malachite incident.").

[26]   *Id.* at 16.

least, they knew (or should have known) about the substance of the reports and/or had access to additional facts rendering their public statements materially false or misleading:

33.     *First*, the October 29, 2020 audit and update reports were prepared in response to an audit "demand" from Company boards that included Mathers and Chin.[27]

34.     *Second*, the Credit Suisse parent board required the Individual Defendants, as members of the executive committee,[28] to "regularly attend" the Company's parent board meetings, at which the October 29, 2020 audit was demanded and at which the final report, as well as regular updates, were received by the board.[29]

---

[27]     *See infra* n.9 (facts showing board demands and Mathers/Chin board membership).  In addition, Mathers also sat on the CSi board and "receiv[ed]" the October 29, 2020 audit report per the Company's public reports.  *See, e.g.*, 2019 CSi Annual Report at 36:

> The CSi Board receives reporting of Client trends, themes, performance and strategic direction.  This reporting and management information allows the Board to have a clear picture of client activities across all relevant engagement points.  Client concentration trends are monitored to ensure that there is a meaningful depth of client relationships to sustain the viability, profitability and growth of individual business lines.

*See also* 2020 CSi Annual Report at 46:

> The CSi Board receives reporting of client trends, themes, performance and strategic direction.  This reporting and management information allows the Board to have a clear picture of client activities across all relevant engagement points. . . .  Client concentration trends are monitored to ensure that there is a meaningful depth of client relationships to sustain the viability, profitability and growth of individual business lines.

*See also id*. at 1 (Mathers on CSi board).

[28]     *See* CSg 2020 Annual Report at 221.

[29]     *See* CSg Board of Directors Charter.  *See also infra* n.51.

- 16 -

35.     *Third*, the parent board required that Gottstein prepare "an agenda for each meeting," which shows that he was aware of the demanded audits.[30]

36.     *Fourth*, as executive committee members, Gottstein, Mathers and Warner were required to "regularly review and co-ordinate significant initiatives" and report any "extraordinary events or risks" to the board – such as those revealed by the audit.[31]

37.     *Fifth*, as the Company's top risk officer (the CRCO), Warner would have known that the board "directed" a unit in her risk group "to take prompt remedial action" following the October 29, 2020 audit report.[32]

38.     *Sixth*, Mathers and Warner co-chaired a committee that was "require[d]" to review – on at least a "monthly" basis – "[a]ll model outputs" from the new risk models implemented in January 2020 to assess credit loss and risk limit breaches, thereby giving them access to credit risk limit breaches in real time.[33]

---

[30]     *See infra* n.51.

[31]     *See* Organizational Guidelines and Regulations at 18.  Gottstein would have received the report for a number of additional reasons.  The Company's board appointed Gottstein as CEO and made him "responsible for the implementation of resolutions" of the board, which would include the execution of the audits demanded by the board.  *See id.*  Similarly, per the board, it was Gottstein's duty to "establish a risk management function" that was supposedly independent from business concerns (*id.*) – *i.e.*, the CRM function that received the "C-" grade.  Warner also reviewed the report per the Company's audit charter because she was responsible for CRM and was the risk function's representative on the Company's executive board.  *See* Internal Audit Charter of Credit Suisse Group AG at 10 ("The full [a]udit [r]eport including all appendices is distributed to the responsible management [and] their superiors up to the responsible ExB [Credit Suisse executive board] member . . . ."); *see also* CSg 2020 Annual Report at 221 (Warner on executive board as CRCO).

[32]     PW Report at 80 n.81.

[33]     *See* March 18, 2021 Form 20-F, 2020 Annual Report at 152-53:

    With effect from January 1, 2020, the [Credit Suisse] Group changed the methodology for the calculation of credit loss provisions due to the adoption of a new accounting standard under US GAAP. . . .  All model outputs are subject to a

39.     **Seventh**, as members of the executive committee, the Individual Defendants received an internal report called the "Group Risk Report."  The report discussed "credit risk exposure" and provided "commentary on key credit risk matters and developments," such as the matters set forth in the counterparty credit risk audit, which the board demanded and which resulted in the September to October 2020 meetings and reports, as well as subsequent regular update reports.[34]

40.     **Eighth**, a committee of the Company's board clawed back a total of CHF 40.8 million ($43.4 million) in compensation from the Individual Defendants and other employees.  These facts also suggest that that same committee fired Warner and Chin, who were terminated around the same time – *i.e.*, shortly after the Archegos collapse.[35]

41.     **Ninth**, Gottstein professed that his "core beliefs" included risk management (¶¶58-59), showing it would be absurd to suggest that he and his direct reports (including Mathers, Warner and Chin) were unaware of the risk failures at issue.

---

monthly review process, and the related expected credit loss assessments require approval by the Senior Management Approval Committee (SMAC) which is jointly chaired by the CRCO [Mathers] and CFO [Warner].

*Compare with* PW Report at 54 (discussing the "new S-EF [potential exposure] model implemented in January 2020" used to assess credit risk limit breaches) *and id.* at 47 (noting that the potential exposure model addresses "'[t]he risk that a counterparty will default on its obligation to [Credit Suisse] before settlement,'" thereby triggering credit losses).

[34]   March 25, 2020 Form 6-K with 2019 Pillar 3 and Regulatory Disclosures Report ("2019 Pillar 3 Report") at 12:

Credit risk is subject to daily monitoring and reporting, and is governed by internal policies & procedures and a framework of limits and controls.  The groups credit risk exposure is subject to formal monthly reporting through the Group Risk Report which provides summary information in relation to the credit risk portfolio composition, rating profile, and the largest single name loans and commitments.  The Group Risk Report also provides qualitative commentary on key credit risk matters and developments, and is discussed at Board of Directors Risk Committee and distributed to the Board of Directors and Executive Board members.

[35]   Update to the 2020 Compensation Report, dated April 6, 2021.

42.     The foregoing facts demonstrate the Individual Defendants' scienter.

**B.      Defendants' October 29, 2020 Materially False and Misleading
Statements About Credit Suisse's Purported Risk Management
Policies and Practices**

**1.      "Credit Limits" as "Primary Risk Controls" to "Prevent
Undue Risk Concentrations"**

43.     On October 29, 2020, Credit Suisse publicly filed its third quarter 2020 ("3Q20")
financial report with the SEC on a Form 6-K (the "3Q20 6-K"), which was signed by Gottstein and
Mathers.[36]   In the report, they told investors that "*[p]rudent risk-taking* in line with the Group's
strategic priorities is fundamental to our business and success."[37]   They further stated: "[a]ll
transactions that are exposed to potential losses arising as a result of a borrower or counterparty
failing to meet its financial obligations or as a result of deterioration in the credit quality of the
borrower or counterparty are *subject to credit risk exposure measurement and management*." *Id.*
They elaborated:

> The CRM framework incorporates the following *core elements*:
>
> •      Counterparty and transaction assessments: application of internal credit
>        ratings (using PD [probability of default]), assignment of LGD [loss given
>        default] and EAD [exposure at default] values in relation to counterparties
>        and transactions;
>
> •      *Credit limits: establishment of credit limits, subject to approval by delegated
>        authority holders, to serve as primary risk controls on exposures and to
>        prevent undue risk concentrations* . . . .

*Id.* at 99.  The statements identified in bolded italics were materially false or misleading when made.

44.     In truth, Credit Suisse's established credit limits did not prevent undue risk
concentrations due to the fact that CRM allowed clients to violate the Company's purported limits at

---

[36]   3Q20 6-K at 2.

[37]   *Id.* at 60.

material levels for indefinite periods of time, as the October 29, 2020 audit and regular, related update reports demonstrated.  As the October 29, 2020 Internal Audit report demonstrated, the Company's core CRM did not oversee "[p]rudent risk-taking" – having received a "C-" grade from the Company's own Internal Audit function, due in part to the fact that it failed to remediate pervasive credit risk breaches.  There were more than 1,000 unremediated risk limit breaches by 3Q20.  The Company's so-called "credit limits" did not permit the Company "to prevent undue risk concentrations" because the Company routinely permitted customers to flout credit limits indefinitely and continue to pose concentration risk – as the Malachite and Archegos examples demonstrate.  These two examples, however, were just the tip of the iceberg.  Assuming they accounted for a few dozen risk limit breaches in the more than 1,000 that the Company permitted customers to amass, an inference arises that dozens, if not hundreds, of other counterparties' risk limit breaches ultimately added up to the 1,004 breaches that the audit team aggregated and reported on October 29, 2020.  Because Archegos *alone* breached limits by hundreds of millions of dollars, a compelling inference arises that Defendants exposed the investing public to billions of dollars' worth of outstanding risk limit breaches without disclosing those breaches – as Gottstein and Mathers knew or should have known.  *Infra*, §V.A.3.

### 2. "Risk Appetite Framework" – "Risk Limits Are Binding Thresholds"

45.     In the 3Q20 6-K, Gottstein and Mathers told investors that the 3Q20 6-K "should be read together with" the Company's 2019 annual report filed with the SEC on Form 20-F on March 25, 2020 (the "2019 Annual Report"), also signed by Gottstein and Mathers.[38]  The 3Q20 6-K also directed investors to particular sections of the 2019 Annual Report "for further information and

---

[38]   3Q20 6-K at 2; *see also* March 25, 2020 Form 20-F, 2019 Annual Report.

additional details regarding our risk management framework and activities." *Id*. at 60.[39]  Instead of

including the entire "Risk appetite framework"[40] section from the 2019 Annual Report in the

3Q20 6-K, in discussing "[r]isk management" in the 3Q20 6-K, Gottstein and Mathers referred

investors to the "'***Risk appetite framework***'" in the "Credit Suisse Annual Report 2019 for further

information and additional details regarding our risk management framework and activities."[41]

> 46.     In the "Risk appetite framework," Gottstein and Mathers repeated the following

statements:[42]

**Risk appetite framework**

*     *     *

**Risk constraints**

> ***A core aspect of our risk appetite framework is a sound system of integrated
> risk constraints. These allow us to maintain our risk profile within our overall risk
> appetite***, and encourage meaningful discussion between the relevant businesses, Risk
> functions and members of senior management around the evolution of our risk
> profile and risk appetite. . . .   The ***risk constraints restrict our maximum balance
> sheet and off-balance sheet exposure*** given the market environment, business
> strategy and financial resources available to absorb losses. . . .   Risk constraints are
> monitored on a regular basis as part of our efforts to ensure they continue to fulfill
> their purposes.

*     *     *

> We define the following types of risk constraints . . . .   Limits, guidelines and
> tolerances are specific threshold levels for a given risk metric.   ***Limits are binding
> thresholds that require discussion to avoid a breach and trigger immediate
> remediating action if a breach occurs***.   Guidelines are thresholds which, if breached,

---

[39]  *Id.* at 2.

[40]  March 25, 2020 Form 20-F, 2019 Annual Report.

[41]  *See* 3Q20 6-K at 60 ("Refer" to "'Risk appetite framework'" in annual report); *see also*
March 25, 2020 Form 20-F, 2019 Annual Report at 140 ("Risk appetite framework").

[42]  "Risk appetite framework" section of March 25, 2020 Form 20-F, 2019 Annual Report at 141-42
("Risk constraints" subsection).

- 21 -

require an action plan to reduce risk below the guideline or to propose, justify and agree to adjust the guideline. Tolerances are designed as management thresholds to initiate discussion, and breach of a tolerance level triggers review by the relevant constraint authority.

47.     The foregoing statements – emphasized in bolded italics – were materially false and misleading when incorporated by reference into the 3Q20 6-K. As the October 29, 2020 Internal Audit report demonstrated, the Company's core CRM was not "sound" – having received a "C-" grade from the Company's own Internal Audit function, due in part to the fact that it failed to remediate pervasive credit risk breaches. Indeed, there were more than 1,000 unremediated risk limit breaches by 3Q20. The Company's so-called "risk constraints" neither allowed Credit Suisse to "maintain [its] risk profile" nor "restrict[ed] [its] maximum balance sheet" exposure because the Company routinely permitted customers to flout the limits for months on end. Likewise, risk limits were not "binding thresholds that require[d] discussion to avoid a breach and trigger[ed] immediate remediating action." Because Credit Suisse systematically allowed its customers to breach risk limits, it did not, and could not, "prevent undue risk concentrations," as discussed above (*infra, e.g.*, ¶44) – as Gottstein and Mathers knew or should have known (*infra*, §V.A.3).

48.     Gottstein and Mathers are liable for the statements identified above for additional reasons. Because they signed the 3Q20 6-K directing investors to particular sections of the 2019 Annual Report that, in turn, made statements about Credit Suisse's risk management framework and activities, Gottstein and Mathers made the ultimate decision to disseminate those statements to investors on October 29, 2020. In doing so, Gottstein and Mathers knew or should have known that: (1) reasonable investors would understand that the sections at issue were materially true (and not misleading) statements about Credit Suisse's risk management framework and activities as of October 29, 2020; and (2) the particular statements at issue from the 2019 Annual Report were, in

fact, falsely and misleadingly describing Credit Suisse's risk management framework and activities

as of October 29, 2020.

### 3.     "Risk Coverage and Management" – "Current Market Conditions"

49.     In the 3Q20 6-K, Gottstein and Mathers also directed investors to the "Risk coverage

and management" section of the Company's 2019 Annual Report, which stated:[43]

**Risk coverage and management**

*     *     *

A ***rigorous credit quality monitoring process is performed*** to provide for early identification of possible changes in the credit-worthiness of clients, and includes regular asset and collateral quality reviews, business and financial statement analysis, and relevant economic and industry studies.  **Credit Risk Management** maintains regularly updated watch lists and holds review meetings to re-assess counterparties that could be subject to adverse changes in creditworthiness.  The review of the credit quality of clients and counterparties does not depend on the accounting treatment of the asset or commitment.

*     *     *

The method[s] for determining the inherent loss in certain lending portfolios is based on a market-implied model using long-term industry-wide historical default and recovery data taking into account the credit rating and industry of each counterparty. A separate component of the calculation reflects ***the current market conditions*** in the allowance for loan losses . . . [another method makes] [q]ualitative adjustments ***to reflect current market conditions*** or any other factors not captured by the model are approved by management and reflected in the allowance for loan losses.

50.     In truth, CRM's credit quality monitoring process was not "rigorous," as the

October 29, 2020 audit report found.  Nor did CRM's methods for estimating potential (or

"inherent") losses consider "current" market conditions as the October 29, 2020 audit report found

---

[43]   3Q20 6-K at 60 ("Refer to . . . 'Risk appetite framework' and 'Risk coverage and management' in III – Treasury, Risk, Balance sheet and Off-balance sheet – Risk management in the Credit Suisse Annual Report 2019 for further information and additional details regarding our risk management framework and activities, including definitions of certain terms and relevant metrics."); *see also* March 25, 2020 Form 20-F, 2019 Annual Report at 143 ("Risk coverage and management" and "rigorous credit quality monitoring" sections).

- 23 -

that "consistent time lag on scenario data [w]as a problem."[44]  That finding is consistent with the fact

that Credit Suisse's risk committees "only had access to data that were four to six weeks old,"

making them "unable to fully appreciate in real time" the risks posed by counterparties under current

market conditions.  *Id.* at 29-30.  Because the risk functions relied on stale market data, Defendants'

statement that their methods reflected "current market conditions" was materially false and

misleading when made.  Gottstein and Mathers knew or should have known as much.  *Infra*, §V.A.3.

51.    Gottstein and Mathers are liable for the statements identified above for the additional

reason that they knowingly disseminated the materially false and misleading statements, as set forth

in detail above.  *Infra*, ¶48.

### C.    Defendants' November 23, 2020 Misstatements

#### 1.    "Credit Exposure Is Monitored Daily to Ensure It Does Not Exceed the Approved Credit Limit"

52.    On November 23, 2020, Credit Suisse publicly filed a regulatory disclosure report

with the SEC on Form 6-K, known as a "Pillar 3" report (the "3Q20 Pillar 3 Report").[45]  The 3Q20

Pillar 3 Report, which was signed by Mathers and Warner, stated that it "should be read in

conjunction with the Pillar 3 and regulatory disclosures – Credit Suisse Group AG 4Q19 and 2Q20"

(the "2019 Annual Pillar 3 Report") – that "includes important information on regulatory capital and

risk management."  3Q20 Pillar 3 Report at 2.  The 2019 Annual Pillar 3 Report was likewise signed

by Mathers and Warner and included the following statements:[46]

---

[44]   PW Report at 54 n.37.

[45]   *See* 3Q20 Pillar 3 Report at 2 ("Refer to 'Pillar 3 and regulatory disclosures – Credit Suisse Group AG 4Q19' under credit-suisse.com/regulatorydisclosures for the annual qualitative disclosures required by the FINMA circular."); *see also* 2019 Pillar 3 Report at 2 (signatories).

[46]   2019 Pillar 3 Report at 44.

**Counterparty credit risk**

**General**

**Counterparty exposure**

[Counterparty credit risk] CCR arises from over-the-counter (OTC) and exchange-traded derivatives, as well SFTs, such as repurchase agreements, securities lending and borrowing and other similar products.  CCR exposures depend on the value of underlying market factors, for example, interest rates and foreign exchange rates, which may be volatile . . . .

**Credit Limits**

All credit exposure is approved, either through approval of an individual transaction/facility (*e.g.*, lending facilities), or under a system of credit limits (*e.g.*, OTC derivatives).  ***Credit exposure is monitored daily to ensure it does not exceed the approved credit limit***.  Credit limits are set either on a potential exposure basis or on a notional exposure basis.  Moreover, ***these limits are ultimately governed by the Group Risk Appetite Framework***.  Potential exposure means the possible future value that would be lost upon default of the counterparty on a particular future date, and is taken as a high percentile of a distribution of possible exposures computed by the internal exposure models.  Secondary debt inventory positions are subject to separate limits that are set at the issuer level.

> Refer to "Credit risk" (pages 146 to 149) in III – Treasury, Risk, Balance sheet and Off-balance sheet – Risk management – Risk coverage and management in the Credit Suisse Annual Report 2019 for further information on credit limits.

53.     The foregoing statements were materially false and misleading when made because credit exposure routinely "exceed[ed] the approved credit limits" by material levels and remained at those levels, unremediated (*infra, e.g.*, ¶44), as both Mathers and Warner knew or should have known (*infra*, §V.A.3).

54.     Mathers and Warner are liable for the statements identified above for additional reasons.  Because they signed the 3Q20 Pillar 3 Report directing investors to "important" statements in the 2019 Annual Pillar 3 Report that, in turn, contained representations about Credit Suisse's "risk management" framework and activities, Mathers and Warner made the ultimate decision to disseminate those "important" statements to investors on November 23, 2020.  In doing so, Mathers

and Warner knew or should have known that: (1) reasonable investors would understand that the sections at issue were materially true (and not misleading) statements about Credit Suisse's risk management framework and activities as of November 23, 2020; and (2) the particular statements at issue from the 2019 Annual Pillar 3 Report were, in fact, falsely and misleadingly describing Credit Suisse's risk management framework and activities as of November 23, 2020.

      **2.**     **"Credit Limits" Serve to "Prevent Undue Risk Concentrations" Within "Rigorous Credit Quality Monitoring"**

     55.    The three "Credit risk" pages of the 2019 Annual Report that Mathers and Warner referenced in their 2019 Pillar 3 Report (*i.e.*, "pages 146 to 149" (*id.*) of the 2019 Annual Report) included the following assurances to the investing public:[47]

**Evaluation and management of credit risk**

     We use a credit risk management framework which provides for the consistent evaluation, measurement and management of credit risk across the Group. Assessment of credit risk exposures for internal risk estimates and risk-weighted assets are calculated based on probability of default (PD), loss given default (LGD) and exposure at default (EAD) models. ***The credit risk framework incorporates the following core elements . . . credit limits: establishment of credit limits***, subject to approval by delegated authority holders, ***to serve as primary risk controls on exposures and to prevent undue risk concentrations.***

               \*       \*       \*

**Credit limits**

     ***Our credit exposures are managed at the counterparty and ultimate parent level in accordance with credit limits which apply in relation to current and potential future exposures***. Credit limits to counterparties and groups of connected companies are subject to formal approval under delegated authority within the divisions where the credit exposures are generated, and where significant in terms of size or risk profile, are subject to further escalation to the Group chief credit officer or CRO.

---

[47]  "Credit risk" contents from March 25, 2020 Form 20-F, 2019 Annual Report at 146, 148.

. . . In addition, credit risk concentration is regularly supervised by credit and risk management committees.

**Credit monitoring, impairments and provisions**

A *rigorous credit quality monitoring process is performed* to provide for early identification of possible changes in the credit-worthiness of clients, and includes regular asset and collateral quality reviews, business and financial statement analysis, and relevant economic and industry studies. Credit Risk Management maintains regularly updated watch lists and holds review meetings to re-assess counterparties that could be subject to adverse changes in creditworthiness.

56. The preceding statements were materially false and misleading when made for the reasons set forth above (*infra, e.g.*, ¶44),[48] as Mathers and Warner knew or should have known (*infra*, §V.A.3). Mathers and Warner also are liable for disseminating "pages 146 to 149" of the 2019 Annual Report, giving "further information on credit limits" on November 23, 2020, because they made the ultimate decision to do so and knew or should have known that reasonable investors would understand that "pages 146 to 149" were materially true (and not misleading) statements about Credit Suisse's risk management framework and activities as of November 23, 2020.

**D.    The December 10, 2020 Board Meeting Materials' "Passing" Update on Archegos and "Numerous Other Counterparties"**

57. The Company's board met on December 10, 2020. The board received an update report in advance of that meeting that addressed, among other things, Archegos and "numerous other counterparties" – albeit in "passing."[49] The December 10, 2020 report provided little detail beyond the October 29, 2020 audit report because there was nothing new to report: "Following the audit [report of October 29, 2020], CRM was directed to take prompt remedial action; however, that did not occur" at any relevant time. *Id.* at 123. CRM's failure to comply with the board's demands to

---

[48]   *See infra*, §V.A.3.

[49]   PW Report at 123.

remedy the problems identified by the audit function required little more than a passing mention in the "*regular*" updates provided to the board by the Company's audit function.[50]

     E.      **Defendants' December 15, 2020 Statements Were Materially False and Misleading**

         1.      **Gottstein Highlights "Holistic Client Oversight" and "Rigorous Credit Standards"**

58.     On December 15, 2020, five days after the December 10, 2020 board meeting, defendant Gottstein provided analysts and investors with an "update . . . on the progress we have made in 2020."[51]  Gottstein's written update assured investors that risk discipline, transparency and a proactive approach to client oversight were some "core beliefs" guiding his conduct and that of the Company's management – including defendants Mathers, Warner and Chin.[52]

---

[50]   *Id.* at 81 n.80:

> In 2020, as a consequence of the Malachite default, the [Credit Suisse] Board directed [Internal Audit] to conduct additional audits, including an audit of CRM's oversight of *counterparty credit risk* within [investment bank] trading products. [Internal Audit]'s report, which was released on October 29, 2020, gave CRM a "C-" rating, reflecting that the overall CCR control environment required "improvement."

*Id.* at 14-15 ("[Credit Suisse] . . . broadened the universe of audits to be performed by [Internal Audit] (including an *audit on counterparty credit risk*), and *regularly updated the Board* on remedial measures relating to the Malachite incident."); *see also* CSg 2020 Annual Report at 207 (admitting that the board's audit committee "received *regular updates* from the Head of Internal Audit on key audit findings"); *see also* Internal Audit Charter of Credit Suisse Group AG at 11 (following a C grade in an audit, "[i]n a subsequent audit or as part of Action Verification, [Internal Audit] verifies agreed *actions completed* by management with respect to the audit issues raised in the previous audit").

[51]   *See* December 15, 2020 Form 6-K at 2.

[52]   *See* December 15, 2020 Presentation by CEO Gottstein, "Credit Suisse Investor Update 2020" incorporated in December 15, 2020 Form 6-K at 5.  On a slide titled, "*[m]y core beliefs*," Gottstein told investors on December 15, 2020 that he was not "losing sight of strong governance, compliance as well as cost and *risk discipline*."  *Id.* at 5.  "My management team and I want to be transparent and to *proactively* address legacy issues, thereby avoiding surprises."  *Id.*  Gottstein included an image of the management team – showcasing Mathers, Chin, Warner and others – in his presentation.  *Id.* at 3.

59.     Gottstein elaborated on his core beliefs in an oral presentation to investors.  He assured investors that "[m]y management team and I strive for transparency and intend to proactively address problems and legacies, where they exist, thereby aiming to avoid surprises."[53] Then he told investors, in substance, that everything was fine on the risk management front:

> In order to position ourselves for growth, we must address areas where we can do better.  With that in mind, **we continue to proactively address legacy issues such as York**[54] or legacy litigation cases.  We are completing ongoing remediation efforts with regulators, building on strengthened governance and our unified chief risk and compliance office organization to strengthen our control effectiveness and holistic client risk oversight.
>
> We took some management action in asset management to position it for long-term growth, and **we are maintaining rigorous credit standards** even as we further grow lending to support client financing needs during the COVID recovery phase going forward.

*Id.* at 6.  These assurances were materially false and misleading.

60.     The York hedge fund loss was similar to the earlier $214 million Malachite Capital hedge fund loss in March 2020, which prompted three Company boards to order the Company's Internal Audit function to conduct the investigation that resulted in the October 29, 2020 audit report.  *Infra*, ¶22 n.9.  As that report and regular update reports found, during 2020, Credit Suisse's counterparty "risk exposure had increased dramatically" as the CRM and business functions "made very little progress" to remedy Archegos' outstanding limit breaches – much less dozens or hundreds of other customers, likely accounting for the hundreds of millions of dollars' worth of risk limit breaches.  *Infra, e.g.*, ¶44.  In light of the foregoing, Gottstein's assurances about having

---

[53]   December 15, 2020 *Refinitiv* Transcript, CSg Investor Update Event at 1-2.

[54]   On November 24, 2020, *The Wall Street Journal* reported the Company would take a $450 million loss on its exposure to a hedge fund known to Defendants as "York."  The loss was the "main[]" cause of a 6% decline in yearly income across the entire Company.  *See* CSg 2020 Annual Report at 238.

"proactively address[ed]" hedge fund issues, "strengthen[ed] . . . holistic client risk oversight" and "maintain[ed] rigorous credit standards" were materially false and misleading when made.

61.     Gottstein knew or recklessly disregarded the true facts that his December 15, 2020 statements concealed.  He had access to the October 29, 2020 audit report and related, regular updates showing that CRM allowed the firm's hedge fund clients – Malachite, Archegos and numerous others making up the 1,000-plus risk limit breaches – to flout supposed credit risk limits on a systematic basis.[55]  In fact, Gottstein admitted on December 15, 2020 that **he** was focused on the CRM function and governance: "[W]e just have to be extremely disciplined in our business behavior.  And for that, we have first line of defense, we have – but also **second line of defense**,[56] namely **risk** and compliance, reputational risk, *et cetera*.  So we have **increased focus on that** and on governance topics around our business behavior."  *Id.* at 51.  In other words, in highlighting the Company's supposedly proactive, holistic and rigorous approach to client credit risk on December 15, 2020, Gottstein made statements about – and thus had in mind – the very function that his own audit team gave a "C-" about six weeks earlier.  These facts further show falsity and scienter.[57]

### 2.    Chin Highlights "Effective" Risk Management, Prioritizing Controls

62.     Also during Credit Suisse's December 15, 2020 investor update, defendant Chin made a presentation that included the following slide:[58]

---

[55]   *See infra* n.9.

[56]   2020 CSg Annual Report at 142.

[57]   *See also infra*, §V.A.3.

[58]   *See* December 15, 2020 Presentation by Credit Suisse Investment Bank CEO Brian Chin, "Credit Suisse Investor Update 2020, Driving sustainable Investment Bank returns," filed publicly by Credit Suisse on Form 6-K with the SEC on December 15, 2020.

Accordingly, Chin represented (under the "[o]perational excellence" heading) that the investment banking division: (1) "[m]onitor[ed] risks through effective partnership between business and control functions"; (2) "[p]rioritize[d] automation, preventative controls, data integrity and supervision"; and (3) "[r]equire[d] principled and ethical behavior with a full awareness of controls, policies and procedures." *Id.*

63. Chin's oral presentation to investors on December 15, 2020 further stated:[59]

> Lastly, we're thrilled to have won top honors in the 2020 awards from The Banker for the Investment Bank of the Year.  Now that we have an integrated [investment banking division], we've been doing some work on diversification and business mix.  You can see here that the integrated [investment banking division]'s diversified business mix has helped lead to lower revenue volatility, which speaks to a more stable earnings for the division.

> On the bottom left chart, you can see the mix of our business between trading, financing and fee-based business is roughly equal at about 1/3 each.  This is a deliberate result of the restructuring, the business mix decisions and ***the tight risk management approach we've adopted over the past few years***.  In the past, you would have seen a more historical reliance on the trading businesses, leading to a

---

[59]   December 15, 2020 *Refinitiv* Transcript, CSg Investor Update Event at 32, 33.

more volatile revenue stream.  We've also done some analysis to look at the volatility of our businesses overall, and you can see the results on the right side of the page.

                    *        *        *

Underpinning [Credit Suisse's] capital discipline is **our proactive risk management**, which has helped us prudently navigate through the COVID crisis. Going forward, we intend to stay within the 1/3 of group capital allocation.  And within that, we absolutely feel that we have enough capital to serve our clients to compete and to generate a return for our shareholders.

64.     Chin's December 15, 2020 statements to investors were materially false and misleading when made.  As the Company's October 29, 2020 audit and related update reports show, during 2020, the investment bank and its CRM control function: (i) had ineffective controls; (ii) had an unclear and fragmented partnership; (iii) permitted clients to flout preventative controls via lengthy, unremediated risk limit breaches (*i.e.*, the bank/CRM did not require principled behavior in the administration of its controls, policies and procedures); and (iv) even **after** its October 29, 2020 receipt of a "C-" from the audit team and being called upon to make "prompt" changes by the board, the banking business and its CRM control function **still** did not remedy the deficiencies.[60]  Chin knew or should have known all of these facts at the time of his December 15, 2020 statements.[61]

## F.     Defendants Highlight Their Risk Limits as Conditions Deteriorate

65.     As Credit Suisse's exposure to risk limit breaches continued largely unabated during January through March 2020, matters got worse.[62]  The Company's audit function would have captured and reported these facts to Defendants, particularly since Archegos was one of the

---

[60]   *See infra* ¶¶22 n.9, 44, 60; §§IV.A.1.-2., V.A.3.; *see also* PW Report at 81 n.80 ("Following the audit [report of October 29, 2020], CRM was directed to take prompt remedial action; however, that did not occur" at any relevant time.).

[61]   *See infra*, §V.A.3.

[62]   *See, e.g.*, PW Report at 16; *id.* at 17 ("By the end of December [2020], the concentration and liquidity risk of Archegos's portfolio had substantially increased.").

investment bank's largest clients that CRM was supposed to oversee.[63]  Yet these circumstances failed to prompt disclosure.

1.   **On February 18, 2021 and March 18, 2021, Gottstein and Mathers Essentially Repeat Their False and Misleading Risk Management Statements**

66.     Instead, Credit Suisse continued to repeat substantially the same materially false and misleading statements that it made previously.  In particular, on February 18, 2021, Credit Suisse publicly filed with the SEC its earnings report for the fourth quarter of 2020 on Form 6-K (the "4Q20 6-K"), which was signed by Gottstein and Mathers.  The 4Q20 6-K incorporated by reference the Company's 2019 Annual Report containing the materially false and misleading statements set forth above.[64]  On March 18, 2021, Credit Suisse publicly filed with the SEC its 2020 annual report on Form 20-F (the "2020 Annual Report"), which was also signed by Gottstein and Mathers.[65]  The 4Q20 6-K and the 2020 Annual Report made statements about risk limits and governance that are the same as or substantially similar to the statements set forth above in ¶¶45-46, 49, *infra*.  The February 18, 2021 and March 18, 2021 filings were materially false and misleading for substantially the same reasons (*infra, e.g.*, ¶44) and for the additional reason that Credit Suisse's risk exposure to hedge fund clients had deteriorated throughout the period leading up to March 18, 2021 (*infra, e.g.*, ¶60), as Defendants knew or should have known (§V.A.3).

---

[63]  *See, e.g.*, PW Report at 20 (noting that, by March 2021, Archegos exposed the investment bank to trades with a gross market value of "$20 billion as compared to the next-largest client at $5 billion, and . . . net-long [positions] . . . of over $7 billion, as compared to the next-largest long-[positioned] . . . client at $1.5 billion").

[64]  *See infra*, ¶¶45-46, 49; *see also* February 18, 2021 Form 6-K, signed by Gottstein and Mathers, attaching fourth fiscal quarter of 2020 earnings release at 2 (stating the report "should be read together with" the 2019 Annual Report).

[65]  *See* March 18, 2021 Form 20-F, signed by Gottstein and Mathers, attaching 2020 Annual Report.

> ### 2. On March 18, 2021, Mathers and Warner Repeat Their Previous False and Misleading Statements, Again Assuring Investors that "Credit Limits" "Are Not "Exceed[ed]"

67.    Also on March 18, 2021, Credit Suisse publicly filed another "'Pillar 3 and regulatory disclosures'" report on Form 6-K (the "4Q20 Pillar 3 Report"), which was signed by Mathers and Warner.[66]  The 4Q20 Pillar 3 Report incorporated the 2020 Annual Report's statements that were materially false and misleading, as noted above – as Mathers and Warner knew or should have known at the time.  The 4Q20 Pillar 3 Report further stated:[67]

> **Credit limits**
>
> All credit exposure is approved, either through approval of an individual transaction/facility (*e.g.*, lending facilities), or under a system of credit limits (*e.g.*, OTC derivatives).  ***Credit exposure is monitored daily to ensure it does not exceed the approved credit limit***.  Credit limits are set either on a potential exposure basis or on a notional exposure basis.  ***Moreover, these limits are ultimately governed by the Group Risk Appetite Framework***.  Potential exposure means the possible future value that would be lost upon default of the counterparty on a particular future date, and is taken as a high percentile of a distribution of possible exposures computed by the internal exposure models.  Secondary debt inventory positions are subject to separate limits that are set at the issuer level.

68.    These statements were materially false or misleading when made due to the pervasive and unremediated risk limit breaches that the Company permitted and its related failure to comply with governing risk limits.  *Infra*, §V.A.1-2, ¶44.  Mathers and Warner knew or should have known as much.  *Infra, e.g.*, §V.A.3.

## VI.    LOSS CAUSATION/ECONOMIC LOSS

69.    The market for Credit Suisse ADRs was open, well developed and efficient at all relevant times.  Throughout the Class Period, Credit Suisse ADRs traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact,

---

[66]    4Q20 Pillar 3 Report at 2.

[67]    *Id.* at 16, 44.

which were widely disseminated to the securities market, investment analysts and the investing public.  Lead Plaintiff and other members of the Class (defined below) purchased or otherwise acquired Credit Suisse ADRs, relying upon the integrity of the market price for Credit Suisse ADRs and market information relating to Credit Suisse, and they have been damaged thereby.

70.     When, in March 2021, the relevant truth became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of Credit Suisse ADRs declined immediately and precipitously because the artificial inflation was removed from the market price of the ADRs, causing substantial damage to Lead Plaintiff and the Class.

71.     During the week of March 22, 2021, the group of prime brokerage banks facilitating Archegos' high-risk strategy became concerned as the market value of some of the stock shares underlying its swaps positions declined.  On Friday, March 26, 2021, several of the large banks offering prime brokerage services to Archegos – including Morgan Stanley, Goldman Sachs and UBS – began liquidating billions of dollars' worth of shares on which Archegos had swap positions at fire sale prices after Archegos failed to meet a margin call.  Credit Suisse – woefully under-margined, due to the fact that it had permitted Archegos to continue making risky bets with Credit Suisse's money while flouting the Company's purported credit "risk limits" – started selling off the deficient collateral that Archegos had provided to Credit Suisse.  Because the collateral backing Archegos' thin margins was dwarfed by the risks it had taken, Credit Suisse racked up billions of dollars' worth of losses.

72.     On March 29, 2021, before the market opened, Credit Suisse issued a press release disclosing that a "significant US-based hedge fund defaulted on margin calls made last week by Credit Suisse and certain other banks" and:

> it is premature to quantify the exact size of the loss resulting from this exit, [but] it could be highly significant and material to our first quarter results, notwithstanding

the positive trends announced in our trading statement earlier this month.  We intend to provide an update on this matter in due course.[68]

73.    CNBC and other financial media outlets reported additional information on the extent of Credit Suisse's credit risk exposure over the ensuing days.[69]  For example, on March 30, 2021, S&P Global Ratings downgraded Credit Suisse's corporate debt rating to negative from stable on concerns about the Company's risk management – thereby substantially increasing the Company's costs of capital.[70]  S&P's press release stated in pertinent part: "[i]n our view, there is a meaningful risk that clarification of the reasons for a potential material loss related to a single client may reveal deficiencies in Credit Suisse group's risk management system or a risk appetite that is not commensurate with the current ratings."[71]

74.    Investors grew concerned about Credit Suisse's financial capacity to bear the losses as additional information entered the market.  As reported by *The Wall Street Journal* on March 31, 2021, Credit Suisse "had a core capital buffer of 12.9% at year-end"; and "[i]f the Archegos hit is $4 billion, that ratio could fall by roughly 1 percentage point to well below the 12.5% minimum

---

[68]    *See* Press Release, Credit Suisse, *Trading Update* (Mar. 29, 2021); *see also North American Briefing: Stock Futures Drop as Banks Warn of Losses*, Dow Jones Institutional News (Mar. 29, 2021).

[69]    *See* Elliot Smith, *Banks warn of 'significant losses' as they exit positions with large U.S. hedge fund*, CNBC (Mar. 29, 2021); Dale Crofts, *Credit Suisse Joins Nomura Warning of Hit from Hedge Fund*, Bloomberg (Mar. 28, 2021); Quentin Webb & Margot Patrick, *Archegos Liquidation Hit Nomura, Credit Suisse; Banks' shares tumble amid pain over losses at firm run by former Tiger Asia manager Bill Hwang*, Wall St. J. (Mar. 29, 2021); *Banking Shares Drive Down S&P 500 – Investors show concern about losses tied to fund unloading billions in holdings*, Wall St. J. (Mar. 30, 2021); Margot Patrick & Kosaku Narioka, *Archegos Blowout Heaps Pressure on Credit Suisse; Shares in the Swiss bank fell again Tuesday, while Japanese bank MUFG warned of a $300 million loss*, Wall St. J. (Mar. 30, 2021).

[70]    *See Credit Suisse Outlook Revised to Negative on Concerns About the Group's Risk Management*, S&P Global (Mar. 30, 2021).

[71]    *Id.*

- 36 -

targeted by the lender."[72]  In addition, *The Wall Street Journal* reported that even if Credit Suisse's capital ratios remained high enough to preclude its being forced to raise additional capital, Credit Suisse "[s]hareholders can expect a suspension of its share buyback program at the least."

75.     The new information entering the market between March 29 and 31, 2021 triggered a three-day decline that wiped out 17.64% of the Company's market value, as the price per ADR fell from $12.87 at the close of trading on Friday, March 26, 2021 to $10.60 at the close of trading on Wednesday, March 31, 2021 on heavy trading volume.

## VII.   NO SAFE HARBOR

76.     The "Safe Harbor" warnings accompanying Credit Suisse's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with generally accepted accounting principles ("GAAP"), including those filed with the SEC on Form 6-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

77.     Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and/or approved by an executive officer of Credit Suisse who knew the FLS was false.  None of the historic or present tense statements made by Defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance

---

[72]   *See* Rochelle Toplensky & Telis Demos, *Archegos' Collapse Is a Wakeup Call for Regulators*, Wall St. J. (Mar. 31, 2021).

when made; nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE

78.     Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

79.     Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Credit Suisse ADRs was an efficient market at all relevant times by virtue of the following factors, among others: (a) Credit Suisse ADRs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient market; (b) Credit Suisse regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (c) Credit Suisse was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

80.     As a result of the foregoing, the market for Credit Suisse ADRs promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the ADRs.  Under these circumstances, all those who transacted in Credit Suisse ADRs during the Class Period suffered similar injury through their

transactions in Credit Suisse ADRs at artificially inflated prices, and a presumption of reliance applies.

81.     Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other Class members purchased or acquired Credit Suisse ADRs between the time Defendants misrepresented and failed to disclose material facts and the time the facts were disclosed. Accordingly, Lead Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Credit Suisse ADRs and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## IX.   CLASS ACTION ALLEGATIONS

82.     Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of Credit Suisse ADRs during the Class Period.  Excluded from the Class are Defendants and members of their immediate families; the officers and directors of the Company at all relevant times and members of their immediate families; the legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which Defendants have or had a controlling interest.

83.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Credit Suisse ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

85.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (a) whether the 1934 Act was violated by Defendants as alleged herein; (b) whether statements made by Defendants misrepresented material facts about the business, operations and management of Credit Suisse; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I
### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

88.     Lead Plaintiff incorporates all of the preceding paragraphs by reference.

89.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were or deliberately disregarded as misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Credit Suisse ADRs during the Class Period.

91.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Credit Suisse ADRs.  Lead Plaintiff and the Class would not have purchased Credit Suisse ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### COUNT II
### For Violation of §20(a) of the 1934 Act
### Against All Defendants

92.     Lead Plaintiff incorporates all of the preceding paragraphs by reference.

93.     The Individual Defendants acted as controlling persons of Credit Suisse within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company and their ownership of Credit Suisse stock, the Individual Defendants had the power and authority to cause Credit Suisse to engage in the wrongful conduct complained of herein.  Credit Suisse controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure, certifying Lead Plaintiff as class representative and designating Lead

Counsel as Class Counsel;

B.      Awarding Lead Plaintiff and the members of the Class damages, including interest;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and attorneys' fees; and

D.      Awarding such equitable and injunctive or other relief as the Court may deem just

and proper.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  November 11, 2021                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                             JASON C. DAVIS


                                                     s/ Jason C. Davis
                                             _____
                                                   JASON C. DAVIS

                                             Post Montgomery Center
                                             One Montgomery Street, Suite 1800
                                             San Francisco, CA  94104
                                             Telephone:  415/288-4545
                                             415/288-4534 (fax)
                                             jdavis@rgrdlaw.com

                                             ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             DAVID A. ROSENFELD
                                             ERIN W. BOARDMAN
                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com
                                             drosenfeld@rgrdlaw.com
                                             eboardman@rgrdlaw.com

- 42 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
rgonnello@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN (IL Bar # 6329016)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

Lead Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 11, 2021, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Jason C. Davis
JASON C. DAVIS

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  jdavis@rgrdlaw.com

**Mailing Information for a Case 1:21-cv-03385-NRB City of St. Clair Shores Police and Fire Retirement System v. Credit Suisse Group AG et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Erin Whitney Boardman**
  eboardman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Richard William Gonnello**
  rgonnello@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **Joel Laurence Kurtzberg**
  JKurtzberg@cahill.com,chong@cahill.com,mpalmer-sherman@cahill.com,MA@cahill.com,lrackow@cahill.com,mconrad@cahill.com,ebuckel@cahill.com,amintz@cahill.com

- **Adam Shawn Mintz**
  amintz@cahill.com,mwheatley@cahill.com,JKoch@cahill.com,MA@cahill.com,CCarroll@cahill.com,lTorres@cahill.com,ABenintendi@cahill.com,eweinstein@cah

- **Sheila Chithran Ramesh**
  sramesh@cahill.com,MA@cahill.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,malbert@ecf.courtdrive.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Steven B. Singer**
  ssinger@saxenawhite.com,e-file@saxenawhite.com

- **Herbert Scott Washer**
  hwasher@cahill.com,MA@cahill.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)